17 P.3d 851

**INDUSTRY MORTGAGE COMPANY, L.P., a Florida corporation, Plaintiff–Appellee,**

v.

**Shari Ann Kehaulani SMITH and Lynnette Leimomi Laimana, Defendant–Appellants,**

and

**John and Mary Does 1–20, Doe Partnerships, Corporations, or Other Entities 1–20, Defendants.**

No. 22438.

Intermediate Court of Appeals of Hawai'i.

Jan. 16, 2001.

Shari–Ann Kehaulani Smith and Lynnette Leimomi Laimana, pro se, on the briefs, defendant–appellants.

Lester K.M. Leu and Gary Y. Okuda, Honolulu, (Leu & Okuda), Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion by LIM, J.

Defendants–Appellants Shari Ann Kehaulani Smith and Lynnette Leimomi Laimana (Borrowers) appeal the circuit court of the first circuit's April 1, 1999 Order Confirming Sale, Distribution of Proceeds, Deficiency Judgment, and For Writ of Possession. A

final Judgment thereon was filed on the same date.

For the following reasons, we affirm.

## I.  Background.

On January 6, 1998, Plaintiff–Appellee Industry Mortgage Company, L.P. (Lender) filed a complaint to foreclose on an $81,000.00 mortgage in default it held from the Borrowers on their leasehold residence in Kaneʻohe. Built in 1964, the residence is a three-bedroom, two-bathroom, single-family home, with an interior area of 1,055 square feet, on 6,417 square feet of land.  Its lease expires on December 31, 2017.

The Borrowers failed to appear, answer, plead or otherwise defend, so on February 19, 1998, the clerk of the court entered default against them.

On August 11, 1998, the Lender filed its motion for summary judgment and interlocutory decree of foreclosure, alleging total arrears on the date of filing of $92,574.51.  The motion was heard unopposed, and on October 14, 1998, the court granted the Lender's motion and entered an order granting summary judgment and an interlocutory decree of foreclosure, along with a judgment of even date which was certified as final pursuant to Rule 54(b) of the Hawaiʻi Rules of Civil Procedure (HRCP).  The Borrowers did not appeal this judgment.  *See Security Pacific Mortgage Corp. v. Miller,* 71 Haw. 65, 69, 783 P.2d 855, 857 (1989) (generally, a mortgagor must appeal from the order granting summary judgment in order to challenge the mortgagee's *right* to foreclose on the mortgaged property and to obtain a deficiency judgment against the mortgagor).

The October 14, 1998 order appointed a commissioner to sell the property.  It read, in pertinent part:

3.  The first mortgage currently held by [the Lender] shall be and is hereby foreclosed as requested, and the property subject to the mortgage shall be sold at public auction, without an upset price, as authorized by law and under the provisions of the first mortgage.  The sale shall not be final until approved and confirmed by the Court.

. . . .

5.  [The commissioner] . . . is hereby appointed as Commissioner by this Court and as Commissioner shall henceforth hold all equitable and legal title to the Property.  The Commissioner is hereby authorized and directed to take possession of the Property, to rent the Property pending foreclosure, if appropriate, and to sell the Property on foreclosure sale to the highest bidder at public commissioner's sale by auction, without an upset price, after notice of such sale first being given by said Commissioner by publication in the classified section of a daily newspaper of general circulation printed and published in the county in which the mortgaged property lies, as may be directed by the Court from time to time.  The notice shall be published once in each week for three (3) consecutive weeks, with the sale to take place no sooner than fourteen (14) days after the third date of publication.  The notice shall give the date, time and place of sale and an intelligible description of the property, and shall disclose all of the terms of sale herein mentioned.  The Commissioner shall have further authority to continue the sale from time to time in his/her discretion.

. . . .

8.  A further hearing shall be held to consider confirmation of the foreclosure sale.

. . . .

10.  [The Lender] and all other parties are hereby authorized to purchase at the foreclosure sale.  The successful bidder(s) at the foreclosure sale shall make a down payment to the Commissioner in an amount not less than ten percent (10%) of the highest successful bid price, such payment to be in cash or by way of certified or cashier's check, provided that [the Lender] may satisfy the down payment by way of offset up to the amount of [the Lender's] secured debts.  At the Court's discretion, the ten percent (10%) down payment may be forfeited in full or in part if the purchaser(s) fail to pay the balance of the purchase price as hereinafter set forth.  In no event, shall the purchaser(s) be liable for damages greater than the forfeiture of

the ten percent (10%) down payment. The balance of said purchase price including the down payment shall be paid to the Commissioner upon approval and confirmation of the sale, provided that [the Lender] may satisfy the balance of the purchase price by way of offset up to the amount of [the Lender's] secured debt if [the Lender] is the purchaser at the foreclosure sale. Costs of conveyance, including conveyance tax, the costs of any escrow, securing possession of the subject property and recording of the conveyance and any orders of this Court, shall be at the expense of such purchaser(s).

11. In the event the Commissioner and/or the Court determine that it would be appropriate to open bids in Court at the hearing to confirm the sale, such open court bidding will be allowed on the condition that any such open court bid is at least five percent (5%) higher than the highest bid received at the public auction or unless otherwise ordered by the Court.

On December 2, 1998, the commissioner filed his report. The report revealed that the commissioner had caused a notice of the foreclosure sale to be published in what appears to be the classified section of The Honolulu Advertiser, a newspaper of general circulation printed and published in the county of Honolulu, on November 1, 8 and 15, 1998. The notice set the auction for December 1, 1998, at noon, in front of the first circuit court building. The notice also contained an intelligible description of the property and all of the terms of sale required to be disclosed by the October 14, 1998 court order. The notice announced two, three-hour open houses, on November 8 and 15, 1998, for viewing of the property by the general public. A copy of the notice was attached to the commissioner's report.

The commissioner also reported that he had visited the property and had prepared a detailed fact sheet for the property, which he transmitted to those who might be interested in bidding. A copy of the fact sheet was also attached to the commissioner's report.

Among other pertinent information, the fact sheet noted that the fee interest in the property was available for purchase. At-

tached to the fact sheet was a copy of a letter from the fee owner-lessor, 1974 Limited Partnership (through its general partner, Kaneohe Ranch Company, Limited), offering the fee for $145,000 if purchased before March 31, 1999. The fact sheet also included information on the lease of the property, and noted a lease rent delinquency on November 1, 1998 of $15,348.75.

As a result of his efforts, the commissioner received twelve inquiries from interested members of the general public, and he provided them the fact sheet and any other information requested. The two open houses drew thirteen visitors. At the auction, however, only a representative of the Lender was present, who put in the sole bid for the property, in the amount of $50,000.00. The commissioner thereupon declared the property sold. Being of the opinion that the bid price was fair and reasonable, the commissioner recommended that the court confirm the sale.

On December 10, 1998, the Lender filed a motion for confirmation of the auction sale, for distribution of the sales proceeds and for a deficiency judgment and writ of possession against the Borrowers.

At this point, the Borrowers made their first appearance in the action, *in propria persona*, by filing on January 6, 1999, their objections to the Lender's motion to confirm. The substance of their objections was as follows:

FIRST: That [the commissioner] violated his commission as an impartial appointee of the court to present the property ... for sale with the intent to receive a *fair and equitable and as high* as any bid can be reasonably obtained.

According to Ernest P. Soares[,] whose affidavit is included as Exhibit "A", while in a phone conversation with [the commissioner] concerning the property ..., Mr[.] Soares was misled and discouraged by commissioner from bidding on the property.

Mr[.] Soares asked [the commissioner] about how much he was asking for the property. [The commissioner] replied $140,000.00. Mr[.] Soares then stated "my

neighbor paid $132,000.00 why are you asking for $140,000.00?" To which the commissioner replied the mortgage company was asking for ... $140,000.00.

Mr[.] Soares then asked "what if I gave $60,000.00 to $70,000.00 as down and take over payments?" The commissioner then replied "the mortgage company won't allow that to happen." [The commissioner] further stated "that even if (Mr. Soares) bid $100,000.00 [he] still would have to pay the $140,000.00."

Mr[.] Soares then stated "I can give a good size [down payment]." [The commissioner] then told Mr[.] Soares that the auction date of the property ... would be held on December 06, 1998.

[The commissioner's] actions toward Mr. Soares [are] outrageous, a [blatant] attempt at trying to discourage Mr. Soares from bidding by quoting a high and almost unreasonable price. [Furthermore, the commissioner] seems to be answering for the [m]ortgage company, is he the mortgage company, and does he decide what the mortgage company will accept and not accept[?] [The commissioner] seems to be very familiar with [the Lender]. It is obvious that [the commissioner] in this instance is not seeking a fair, equitable, and highest price for the subject property. In a final effort[, the commissioner gave] Mr. Soares[,] a prospective buyer[,] an auction date that is five days past the actual bid date.

On December 01, 1998 at 10:00 [a.m.], defendant [Lynnette Leimomi] Laimana called [the Lender] and spoke to Victoria who works in the Loan Processing [Department] with the intention of offering a partial settlement of $10,000.00 and a payment plan to bring the balance current. I was told that the property was already sold and that when they take over possession of the property I would have [to] vacate the premises immediately and also be required to pay the [deficiency] amount. I could not understand how the property could be sold when the auction had been scheduled to begin at 12:00 noon that same day. We now know that the plaintiff was the **only** bid offered that day.

There are two facts that [raise] some serious questions. Fact 1, that [the Lender] had to know ahead of time that they would be placing a bid[ ] (at half of their outstanding loan)[.] Fact 2, that [the Lender] through [their] agent Victoria knew (or thought she knew) that the sale was completed *and* that there was *a deficiency* amount, two hours before the actual auction began. It should be noted before the court that [the Lender] and the person Victoria to whom I spoke with reside in Florida, and therefore may not have been aware of the time difference. But they did expect to win the bid at a [ridiculously] low price. We can only conclude that [the Lender] knew that they would not only be the *low* bidder but the *only* bidder on the property, and this could not have happened without the help of [the commissioner].

Mr. Soares is a neighbor of [the Borrowers] and has nothing to gain from his testimony. He had sold some property in California and was looking to invest in another residence here in Hawaii. He was familiar with [the Borrowers] and interested in bidding on the property, but was [surprised] at the conduct of the commissioner and the commissioner's actions or reactions towards him that led him to contact [the Borrowers]. Mr. [Soares'] testimony does show that [the commissioner] has not conducted himself in a fair and equitable manner towards [the Borrowers] or Mr. Soares, [in fact] in this instance the commissioner has shown a bias heavily in favor of [the Lender], creating the existence of [collusion] and fraud.

Taking into consideration the affidavit of Mr. Soares, [the Borrowers'] statement of [the Lender's] reaction to the possibility of a settlement, and the fact [that the Lender] was the only bidder with a bid price almost half of the loan amount, it is obvious that [the Lender] and commissioner conspired together and acted in bad faith towards [the Borrowers] to commit fraudulent acts, to deprive [the Borrowers] of not only [their] property but also future earnings.

(Emphases in the original.) The foregoing, where applicable, accurately reflected the

content of Soares' "affidavit" (it was not notarized or otherwise sworn).

At the January 14, 1999 hearing on the Lender's motion to confirm, the Borrowers appeared with a notarized copy of Soares' affidavit. Complaining "that the [$]50,000 was not a fair and equitable [price for the property,]" the Borrowers reiterated, in general but consistent with their filed objections, their charges of "fraudulent mishandlings."

In response to the Borrowers' general complaint of an inequitable price, the commissioner explained that

[a]s far as the bid price of [$]50,000, the property is [leasehold] and the lease is made available by the landowner, if purchased before March 31st, 1999. They're offering it for $145,000.

In addition to that, the lease rent at this time is—there's an amount of approximately—right now, because it's January 1st, approximately $18,000 that's due and owing, so that total combined price, the [$]50,000 for the bid, plus approximately [$]18,000 for the lease rent that's due, is about—would come to approximately [$]68,000, and then this fee that will bring the property price to approximately $213,000. And I felt that, given the state of the market, if it was a cash purchase without commissions to realtors, that will be somewhere in the range of what comparable houses may sell for.

With respect to the allegation that the Lender had let slip—in its pre-auction telephone conversation with borrower Laimana—that its bid purchase and the resulting deficiency was a done deal, the Lender's attorney offered the reality of lender bids in foreclosure, but was otherwise nonplussed:

I did see the objection that was filed. There [were] some questions about[,] they talked to [the Lender] saying that [the Lender] needed to place a bid. Your Honor, in all bids, a lender has to prepare a bid before any type of auction, so that's really expected.

Regarding that we knew about[,] if there's gonna be—that there will be only bidders that—I don't think that when they talked to the contact in the mainland— they're several hours ahead—that the auction still didn't go there at that time, so I don't think that they would have known they will be the only bidder.

The second issue I raise, Your Honor, is that the fact is that nobody else appeared at the auction. It was published and the commissioner did his duties, and today we're here again. If there was a party that wanted to bid a higher price, they could do so. And so that we don't feel [there is] any prejudice, that this motion should be granted.

The Borrowers did not mention, however, the alleged telephone conversation at the hearing or at any later time, until this appeal.

The court, in turn, was more concerned about Soares' professed interest in the property. Noting that no one, not even Soares, had shown up at the confirmation hearing to reopen the bidding, and allowing that "it appears, based upon the affidavit of Mr. Soares, that he may be the initial bidder[,]" the court continued the confirmation hearing for one week. The court directed the commissioner, in the interim,

to communicate with Mr. Soares to determine whether or not—if, in fact, he is a qualified and able bidder, and whether or not he intends to place a bid, and if so, [whether] there should be a reopening [of the bidding] next week, and if he will appear, in fact, to place a bid.

The court explained to the commissioner that it was taking its course of action "so that you'll have a chance to at least look at this and see if you can contact Mr. Soares to see if, in fact, this is a genuine offer or interest."

On January 15, 1999, the commissioner filed a copy of a letter he had mailed to Soares the same day. The letter indicated that the commissioner had attempted to call Soares only to find that his telephone number is unlisted. The letter was styled as a response to Soares' affidavit, and expressed in general the commissioner's regret at Soares' "obvious confusion as to the facts and procedures of this foreclosure." In particular, the letter informed Soares that:

1. The mortgage company does not own the property.

2. The property was offered at auction with no upset (asking) price. This is clearly stated on the fact sheet and in all advertising.

3. The property was and is offered in Leasehold. This is clearly stated on the facts sheets and in all advertising.

4. The Fee owner, Kaneohe Bay [sic] Ranch, Ltd. (not me, the Court, nor the mortgage company), is asking $145,000 for the Fee interest in the property (pursuant to the terms and conditions of their letter dated November 7, 1998), a copy of which was provided to any and every interested party.

5. The property is being sold by the Court under a foreclosure process. The Court does not provide financing to prospective buyers. Your inquiry as to making a down payment and paying off the balance may have been misunderstood by me to mean the Court accepting an offer contingent upon financing. That clearly would not be acceptable to the Court. However, this arrangement may have been possible by your making an offer to the mortgage company through me, the Commissioner, by way of a "private sale." It is possible that I told you the Court would not accept an offer contingent on seller financing, but I certainly did not tell you that the mortgage company "would not allow that to happen."

6. Again, this foreclosure sale only includes the Leasehold interest in the subject property. The successful bidder is not required to purchase the Fee interest. The letter from Kaneohe Bay [sic] Ranch, Ltd. (Nov. 7, 1998) was included as part of the fact sheet for prospective bidders['] information.

7. At the time of the auction I had researched for sales of comparable properties in the immediate area of the subject property that had sold over the previous 12 months and did not find any. I would greatly appreciate it if you would provide me with the address (and date, if possible) of the $132,000 sale that you referred to in your affidavit. Do you know if that sale was in fee, or leasehold? If the sale was recent enough it may have some relevance to the value of the subject property.

The letter also informed Soares about the opportunity to reopen the bidding for the property at the continued confirmation hearing:

> You still have a chance to make a bid for this property. As a result of your affidavit, [the court] postponed the Confirmation date until, January 21, 1999, at 8:30 a.m., Fourth Floor, Judge ..., at the First Circuit Court, 777 Punchbowl Street, Honolulu, Hawaii 96813. If you are interested in bidding[,] please be there.

> The high bid at auction was $50,000.00. The Court will reopen bidding at this January 21, 1999 Confirmation Hearing if someone is willing to pay five percent (5%) more, or $52,500.00, in this case. Please remember, that 10% of the highest bid is payable to the Commissioner, in cash, certified or cashier's check at the close of bidding by the successful bidder. Potential bidders must show me, the Commissioner, cash, certified or cashier's check prior to opening of bidding.

> Copes of the fact sheet, Kaneohe Bay [sic] Ranch, Ltd. letter (Nov. 7, 1998) and a Disclosure of Sale Terms form are enclosed for your review. Please pay [particular] attention to the lease rent [delinquency], stated in the letter from Kaneohe Bay [sic] Ranch, Ltd. (Nov. 7, 1998). The Lessor will require that the lease rent be brought up to date at closing. The successful bidder will be liable for this amount, in addition to the bid price, at closing.

At the continued confirmation hearing on January 21, 1999, the Lender and the commissioner informed the court about the letter the commissioner sent to Soares. Neither Soares nor any other interested party attended the hearing. Although the Borrowers apparently asked Soares about his intentions before the hearing, the record is devoid of any indication Soares persisted in his in-

terest in the property. Nonetheless, the Borrowers took a new tack at the hearing:

> Yeah, we went to talk to Mr. Soares to find out exactly what his intentions are.
>
> But what we wanted to bring up at this time, Your Honor, is that what we feel—it's not whether or not Mr. Soares is gonna make a bid or not, it's how many other potential bidders had a misunderstanding according to his letter—letter which was sent to Mr. Soares; that's my main concern.
>
> I mean, the auction was to get the highest bidder, which is what we're hoping for. What we found out was that there was a misunderstanding with Mr. Soares. That's one potential bidder. How many others were there that could have been misunderstood or persuaded not to come forward? And that's our major concern is we wanted to have at least the right to due process, which is fair and equal treatment. We feel it hasn't happened.
>
> So what we're trying to see is—you know, my understanding is what exactly is [the commissioner's] job in the process? Maybe I'm not understanding what that should be.

The court responded to this new concern:

> Well, a commissioner's job, in part, is to follow established procedures in conducting and notifying and advertising for a public auction. There's nothing in the record before me that indicates that [the commissioner] didn't do his job or did anything which was irregular or improper or somehow in violation of established procedures.
>
> I can understand your concerns about whatever the price being—having been determined following the auction, perhaps not being as high a price as you may have wished but that is frankly the nature of the process and of the auction as it goes forward.

But the Borrowers persisted:

> Your Honor, I just wanted to make another comment, if I could; that is, one of my current concerns, which is one of the biggest issues that I feel has not been tapped into is I'm not only looking for the highest bidder, which could be basically anything, I'm looking for how many others potentially were misunderstood that could have been misled. That is my biggest concern.
>
> And, you know, I noticed that in the last report that the Commissioner had—had sent to us, it basically stated that there were other facts or information stated to various other potential bidders.
>
> My thing—my feeling on this matter is, you know, to, I guess, dissuade this whole mess, is I would—I would want to know if they were misunderstood as well, or if they were led to not bid for the property, because my understanding is that this should be a neutral, unbiased practice, correct?
>
> And that when he turned over the status information on what the cost of the property is, the [leasehold] and so on and so forth, that that basically tells the information. Then isn't it up to the prospective bidder to make their bid known, not to be persuaded not to make a bid, which is what I'm getting from Mr. Soares' affidavit.

Unpersuaded, the court confirmed the auction sale of the property:

> Well, if part of your suggestion, Ms. Laimana, is that there may have been other people who may have been misinformed who may have been willing to place a bid, those frankly—those issues are frankly so speculative and so contingent, and they are unsupported by any admissible competent evidence before the Court.
>
> Your objections are noted, but this motion is granted in [its] totality.

After the January 21, 1999 confirmation hearing, the Borrowers filed, on March 22, 1999, more objections to the confirmation of the auction sale. In these written objections, the Borrowers reiterated their contention that the commissioner had misled Soares and discouraged him from bidding for the property. They also added two further contentions not raised in their January 6, 1999 objections or in any hearing related to those previous objections.

First, the Borrowers demanded return of the original mortgage note, upon entry of judgment in favor of the Lender. They expressed their concern over "double liability"

if the Lender were to hold both a negotiable instrument from them and a judgment against them arising out of the same instrument.

Second, the Borrowers claimed that they had

brought to the court to bid on the property prior to the confirmation of sale a person who would have placed a bid with the court. The Court did not offer to anyone or ask if anyone present was interested in bidding on the property. Instead [the judge] at the end of the proceeding confirmed the sale without asking for anyone interested in bidding. [The Borrowers'] rights to fair and equal treatment and due process were again violated.

On April 1, 1999, the court entered its order confirming the sale, distributing the proceeds of the sale and providing for a deficiency judgment and a writ of possession against the Borrowers. A judgment of even date was also entered, certified as final pursuant to HRCP Rule 54(b).

## II.  Jurisdiction.

On April 19, 1999, the Borrowers filed their notice of appeal of the order confirming the auction sale of the property and entering a deficiency judgment against them. Their appeal challenges, in essence, the fairness of the auction price, and hence the amount of the deficiency judgment to follow. We therefore have jurisdiction to entertain their appeal. *Hoge v. Kane I*, 4 Haw.App. 246, 247, 663 P.2d 645, 646–47 (1983); *Security Pacific*, 71 Haw. at 71–72, 783 P.2d at 858 (where a mortgagor challenges the *amount* of the deficiency judgment, the mortgagor may appeal from the order confirming the sale of the property foreclosed upon).

## III.  Standard of Review.

We have long held that "[t]he lower court's authority to confirm a judicial sale is a matter of equitable discretion. If the highest bid is so grossly inadequate as to shock the conscience, the court should refuse to confirm. In exercising its discretion, the court should act in the interest of fairness and prudence and with just regard for the rights of all concerned and the stability of judicial sales." *Hoge v. Kane II*, 4 Haw.App.

533, 540, 670 P.2d 36, 40 (1983) (citations omitted). Hence, "[t]he exercise of discretion by the lower court judge will not be disturbed on appeal except for abuse. *Brent v. Staveris Development Corp.*, 7 Haw.App. 40, 45, 741 P.2d 722, 726 (1987) (citation omitted). A trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant. *Kealoha v. County of Hawai'i*, 74 Haw. 308, 318, 844 P.2d 670, 675 (1993).

## IV.  Discussion.

On appeal *in propria persona*, the Borrowers urge upon this court, in scattershot fashion, the same arguments they made below, and request that we vacate the order confirming the auction sale and remand for a resale of the property by a different commissioner.

First, the Borrowers fault the trial court for ignoring Soares' affidavit and their arguments that he was misled and discouraged from bidding for the property by the commissioner.

As detailed above, however, the court hardly ignored the issue in directing the commissioner to communicate with Soares regarding his interest in the property, and in continuing the confirmation hearing for one week to allow Soares an opportunity to reopen the bidding on the property.

Although the letter the commissioner sent to Soares in the interim implied that Soares had been confused and not misled, it nonetheless corrected any misinformation that might have been conveyed and instructed Soares in detail about how to go about reopening the bidding on the property. Despite all this, neither Soares nor any other interested party appeared at the continued confirmation hearing to reopen the bidding.

The Borrowers raised a related concern at the continued confirmation hearing on January 21, 1999—that other prospective bidders might have been similarly misled and discouraged. In light of the thorough, accurate and conscientious notice and fact sheet regarding the property and its sale provided to

the general public and interested parties by the commissioner, and in the brighter light of the complete absence of any evidence of other instances of misinformation or misled and discouraged bidders, we agree with the court that this concern of the Borrowers was too speculative to warrant further delay in order to market and bid the property anew.

In this respect, the opening brief also faults the court for ignoring the alleged telephone conversation that borrower Laimana had with the Lender, in which she claimed that the Lender exhibited a suspicious prescience about the outcome of the auction to follow, foreknowledge the Borrowers charge could only come from corrupt collusion between the commissioner and the Lender. There is, however, no evidence in the record concerning this incident, other than unsworn allegations in the opening brief and in the January 6, 1999 objections filed by the Borrowers in the proceedings below. Moreover, at the two confirmation hearings held on January 14 and 21, 1999, the Borrowers did not avail themselves of the opportunity to remedy this deficiency through testimony or other evidence. Indeed, the Borrowers did not argue or otherwise mention the incident at either of the hearings.

We conclude that the court did not abuse its discretion in this first respect.

■ Second, the Borrowers fault the court for not expressly inviting prospective bidders to reopen the bidding before finally confirming the auction sale at the continued confirmation hearing on January 21, 1999. In their second set of written objections, filed on March 22, 1999, the Borrowers averred that they had "brought to the Court to bid on the property prior to the confirmation of sale a person who would have placed a bid with the court." In their opening brief, the Borrowers claim that they "had in the Courtroom Mrs. Jane Laimana who was representing a Mr. Ian Cornish and was prepared to offer a bid on the property."

Whatever truth this allegation may contain, the simple answer to this point on appeal is that no one came forward at the hearing with a desire to reopen the bidding. The transcript of the January 21, 1999 hearing reveals appearances by the Borrowers,

the commissioner and the Lender's attorney. No prospective bidders appeared initially or spoke up thereafter. The Borrowers did not inform the court that a "Mrs. Jane Laimana," presumably a relative, was there representing an interested bidder. No "Mrs. Jane Laimana" and no "Mr. Ian Cornish" made themselves or their interest in the property known to the court. Nothing in the record indicates that any prospective bidder, be it Mrs. Laimana or Mr. Cornish or any other interested person, was somehow so cowed or overawed by the court at the confirmation hearing that an express invitation from the court was necessary to bring that bidder forward.

Hence, we conclude that the court did not abuse its discretion in this second respect.

■ Third, and finally, the Borrowers contend the court erred in failing to order the return of the original mortgage note, thus exposing them to the possibility of "double liability" should the holder of the negotiable instrument decide to enforce it, the judgment on the note in this proceeding notwithstanding.

Because the liability of the Borrowers to the Lender was finally determined in these proceedings and is hence hereafter *res judicata* as to the Lender and any assignee, we conclude that the court did not abuse its discretion in this final respect. *See In the Matter of the Bernice P. Bishop Estate*, 36 Haw. 403, 416 (1943) ("The judgment of a court of competent jurisdiction is a bar to a new action in any court between the same parties or their privies concerning the same subject matter, and precludes the relitigation, not only of the issues which were actually litigated in the first action, but also of all grounds of claim and defense which might have been properly litigated in the first action but were not litigated or decided.").

In its general essence, the Borrowers' appeal faults the court for confirming the auction sale instead of requiring another round of marketing and auction of the property. In *Brent, supra*, we encountered a similar situation. The appellant, a second mortgagee left with a deficiency judgment, argued on appeal

that the lower court erred in reopening the bidding at the confirmation hearing instead of ordering "new notice and a new public auction, [because] the sale would have attracted more bidders and obtained a higher sale price." *Brent,* 7 Haw.App. at 45, 741 P.2d at 726.

We confirmed the lower court's discretion in such a situation:

> In dealing with the problem of a conflict between the court's obligation to maintain the stability and purpose of the judicial sale and its duty to obtain the highest possible price for the real estate being sold, the Nebraska Supreme Court held that "a certain amount of judicial discretion [is] necessarily vested in the court to shield and promote justice under all circumstances." *Rupe v. Oldenburg,* 184 Neb. 229, 232, 166 N.W.2d 417, 420 (1969).

*Id.* (brackets and italics in the original).

We went on to hold, under circumstances conceptually similar to those we face here, that the appellant's conjecture about the higher price a new sale might yield was just that, conjecture, and insufficient to establish an abuse of discretion on the part of the lower court:

> The circumstances of this case reduce to pure conjecture [the appellant's] argument that a resale after further notice would ensure that a substantially greater sale price would have been obtained. The public auction in this case was held after due notice, and after efforts to sell the property at private sale. All interested parties were afforded the opportunity to bid for the property. Since the commissioners allowed offers to continue after the auction was formally closed and interested parties were *informed of the confirmation hearing* date, all interested parties, whether they were at the auction or not, had knowledge of the [highest auction] bid by the time of the confirmation hearing, and were aware that they could still offer to buy the property at a higher bid. In effect, the commissioners left the auction open for more bids right up to the confirmation hearing and, in essence, the lower court merely kept the auction going. Anyone who thought the property was worth more than

the [highest auction] bid could have made a higher bid and [the reopening bidder] did so. Even if a new sale had been ordered by the lower court, there is no guarantee that more interest in the property would have been generated, or that the successful bid at the new auction would have been as high or higher than [the reopening bidder's] final open court bid. Moreover, a new sale would have entailed more costs for the parties involved.

> Under the circumstances, the trial court did not abuse its discretion when it reopened bidding at the confirmation hearing, *Rupe, supra,* and did not err in confirming the sale to [the reopening bidder] for his high bid[.]

*Id.* at 46–47, 741 P.2d at 726–27 (italics in the original). The only material difference in this case is that the only identified reopening bidder, Soares, did not show up at the confirmation hearing after due information and notice. Under our circumstances, *Brent* counsels that new notice and a new public auction offered purely conjectural gain, and that it was not an abuse of discretion for the court to confirm the original, and only, auction bid.

■ As for the bid price so confirmed, we note the commissioner's defense of it at the first confirmation hearing, quoted above, and conclude that it was not "so grossly inadequate as to shock the conscience[.]" *Hoge II,* 4 Haw.App. at 540, 670 P.2d at 40.

## V. Conclusion.

For the foregoing reasons, we affirm the April 1, 1999 Judgment of the first circuit court, and the underlying Order Confirming Sale, Distribution of Proceeds, Deficiency Judgment, and For Writ of Possession, of even date.