143 P.3d 23

The 7'S ENTERPRISES, INC.,
Plaintiff–Appellee

v.

Kaoru DEL ROSARIO, Defendant–
Appellant

and

John Does 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe Partnerships 1–10; Doe Entities 1–10; and Doe Governmental Units 1–10, Defendants.

No. 27364.

Supreme Court of Hawai'i.

Sept. 13, 2006.

Emlyn Higa, on the briefs, for defendant-appellant.

William L. Goo and Norman H. Suzuki (Suzuki & Goo), on the briefs, Honolulu, for plaintiff-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

We hold in this appeal by Defendant–Appellant Kaoru Del Rosario (Defendant), who has been enjoined from working or otherwise being employed as a "briefer" in the State of Hawai'i for a period of three (3) years from July 31, 2004, that (1) training that provides skills beyond those of a general nature may be considered in weighing the reasonableness of a non-competition covenant (the covenant), when such training is combined with trade secrets, confidential information, or special customer relationships weighing in favor of a protectable business interest, (2) the finding by the circuit court of the first circuit (the court) [1] that the training of a briefer such as Defendant is "unique" was not clearly erroneous in light of the evidence in the record, (3) under the circumstances of this case, the court did not abuse its discretion in ruling that the reduction in Defendant's salary by Plaintiff–Appellee The 7's Enterprises, Inc. (Plaintiff) did not amount to "unclean hands," (4) the court did not err in ruling that Plain-

---

1. The Honorable Victoria S. Marks presided.

tiff suffered irreparable harm from Defendant's continued work as a briefer following her resignation, and (5) the court did not err in concluding that the three-year non-competition period was reasonable. Accordingly, we affirm the May 24, 2005 judgment of the court, as amended by the court's July 11, 2005 amended judgment in favor of Plaintiff, except we remand to the court with instructions to amend the judgment to reflect that Plaintiff is enjoined from being employed as a briefer in the County of Honolulu as provided for in the covenant rather than in the State of Hawai'i as the court concluded.

I.

In 1994, Defendant entered into an Employment Agreement with Plaintiff. According to the court, "[b]riefers employed by Plaintiff are primarily hired to promote and sell products from its shop and to sell optional tours and souvenir items" to travel agencies with which Plaintiff had contracted. The employment agreement contained a covenant which precluded an employee from engaging in briefing services on the island of Oahu for a period of three years after the termination of employment with Plaintiff or resignation.[2] Defendant was aware of the covenant, but felt it did not apply to her as long as she was not directly employed by a tour company. There are only three briefing companies in the State of Hawai'i, Plaintiff included.[3]

Defendant's training included memorizing scripts, observing actual briefing sessions, responding to questions from customers, and

being critiqued as part of the on-the-job training. Defendant was paid $1,400.00 per month during her two-month training period. After this time, Defendant's contract base salary was $2,000.00 per month and she collected 1% commission on her sales.

Defendant first resigned in November 1995 and was rehired by Plaintiff in August 1996. Upon rehiring, Defendant entered into a second employment agreement (the Agreement), which was identical to the one she entered into in 1994.

Defendant was Plaintiff's lowest producer; she did not garner as much business for Plaintiff's store as other briefers. Between 1997 and 2000, Defendant's salary was reduced for certain months by amounts between $200.00 and $800.00 based on her job performance.[4] Defendant did not object to the salary reductions. During this time, Defendant was paid all of her sales commissions. Following the "9–11" incident, between November 2001 and January 2002, employees of the company received reduced salaries as a result of a drop in tourism activity. In 2002, Plaintiff began to use Defendant less. When Plaintiff did call Defendant to work, Defendant was sent to smaller groups, thereby reducing the possibility of significant commissions.

Defendant claimed that in June 2004, she discovered that one of the tour companies that had contracted with Plaintiff for briefers, H.I.S. Hawaii, Inc. (H.I.S.), intended to stop using Plaintiff and to utilize briefers from another company.[5] Defendant volun-

---

2. The parties' Employment Agreement includes the following non-competition covenant (the covenant):

7. *Non–Competition.* Employee agrees that, during the terms of this Agreement and for a period of three (3) years thereafter, within the County of Honolulu (Island of Oahu), State of Hawaii, Employee will not directly or indirectly, own, manage, operate, control, be employed as a "Briefer" by, be contracted as a "Briefer" by, participate in, or be connected in any manner with the ownership, management, operation, or control of, any business similar to the type of business conducted by the Employer at the time this Agreement terminates. In the event of the Employee's actual or threatened breach of this paragraph, the Employer shall be entitled to a preliminary or temporary restraining order and injunction restraining Employee from violating its provision. Noth-

ing in this Agreement shall be construed to prohibit the Employer from pursuing any other available remedies for such breach or threatened breach, including the recovery of damages from the Employee.

3. According to Fusami Laurent (Laurent), Plaintiff's president, other briefing companies do not require a covenant in their employment agreements.

4. At trial, Laurent testified that Defendant's salary was reduced at different points from $2000.00 to $1800.00, to $1600.00, and to $800.

5. John Shortridge, chief operating officer of H.I.S. Hawaii, Inc., testified that the company decided to cease using the services of Plaintiff after receiving "many complaints" from tourists.

tarily resigned on July 31, 2004. According to Plaintiff's president, Fusami Laurent (Laurent), she had learned that H.I.S. management wanted to hire one of Plaintiff's briefers, and in order to do this H.I.S. would make the employee want to leave Plaintiff's company in order to be employed by H.I.S. After leaving Plaintiff, Defendant contacted H.I.S. to inquire if it would hire her. H.I.S. stopped using Plaintiff in August 2004. Shortly after leaving Plaintiff, Defendant formed a company called Shiella LLC with her husband and began doing work as a briefer. On August 15, 2004, Defendant began working for Four Seasons Agency of Hawaii, Inc., which provided briefing services through Shiella LLC to H.I.S., Plaintiff's former client.

On October 20, 2004, Plaintiff filed its Complaint for Injunctive and Other Relief (the Complaint), seeking to enjoin Defendant from continuing to engage in conduct in violation of the Agreement. Plaintiff also prayed that it be awarded general and/or specific damages, attorney's fees and costs, and such other and further relief which the court "deems to be fair and just." On October 22, 2004, Plaintiff filed its Motion for Issuance of Preliminary Injunction (motion for preliminary injunction) requesting that the court enjoin Defendant from working as a briefer until a trial on the merits.

On November 12, 2004, Defendant filed her answer to the Complaint as well as a counterclaim alleging, *inter alia,* that Plaintiff (1) "failed and refused to provide employment to Defendant as required under the terms of the . . . Agreement," (2) "failed and refused to pay Defendant the full amount of commissions due under the terms of the . . . Agreement," and (3) "failed and refused to pay Defendant the full amount of base salary due under the terms of the . . . Agreement."

On March 1, 2005, following a hearing, the court granted Plaintiff's motion for preliminary injunction. The court issued, *inter alia,* the following findings of fact (findings):

2. Briefers employed by Plaintiff are primarily hired to promote and sell products from its shop and to sell optional tours and souvenir items for which Plaintiff has

entered into contracts with travel agencies . . . .

3. Laurent . . . trains the company's [b]riefers . . . .

4. *The training which may take several months or longer involves complete memorization of scripts, observing of [sic] actual briefing sessions and responding to questions from customers* . . . .

5. There are only three (3) briefing companies in Hawaii.

. . . .

9. Defendant was aware that the Agreement contained [the covenant], but felt that it did not apply to her as long as she was not employed directly by a tour company.

. . . .

11. After deciding to leave Plaintiff, Defendant contacted . . . [H.I.S.] to inquire if it would hire Defendant as a [b]riefer . . . .

. . . .

15. *Defendant continued to sell optional tours and gift packages for . . . H.I.S., which was a former client of Plaintiff* . . . .

. . . .

17. From time to time, Plaintiff reduced Defendant's base salary based on her job performance . . . .

18. Defendant did not object to the salary reduction . . . .

19. *Plaintiff continued to pay Defendant her full base salary after the 9–11 terrorist incident* . . . .

(Emphases added.) The court, in its conclusions of law (conclusions) ruled as follows:

1. *The [covenant] in the Agreement was reasonable in scope and duration.*

2. Defendant breached the . . . Agreement by continuing to work as a [b]riefer after she left Plaintiff.

3. Under the sliding scale standard set forth in *UARCO, Inc. v. Lam,* 18 F.Supp.2d 1116 (D.Haw.1998), there is a strong likelihood that Plaintiff will prevail on the merits of the case.

4. There is a possibility that Plaintiff suffered irreparable harm.

5. Plaintiff is entitled to preliminary injunctive relief.

(Emphasis added.) The court ordered that Defendant be "immediately enjoined from working or otherwise being employed as a [b]riefer." [6]

On May 24, 2005, after a bench trial, the court found for Plaintiff on its complaint for injunctive relief, and found for Defendant on her counterclaim for breach of the employment contract. The court adopted the findings filed on March 1, 2005, regarding the motion for preliminary injunction. The court also found, *inter alia*, as follows:

2. *Plaintiff has and will suffer a loss of customers or clients as a result of Defendant leaving Plaintiff's employ and working elsewhere as a briefer.*

3. *It is difficult to measure the damages suffered by Plaintiff as a result of Defendant leaving Plaintiff's employ and working elsewhere as a briefer.*

4. The purpose of the [covenant] in the ... Agreement was to prevent a briefer from seeking employment elsewhere using the special training received while employed by Plaintiff.

5. The training of and the services performed by a briefer are unique.

6. *Defendant acquiesced to the reduction in her salary and did not terminate her employment with Plaintiff at that time despite having grounds to do so.*

7. Plaintiff did not pay Defendant ... her full salary during the time that she was employed....

8. *Plaintiff's conduct in not paying Defendant ... her full salary does not amount to unclean hands.*

(Emphases added.) In its conclusions, the court ruled in the following manner:

2. *The [covenant] was reasonable in scope and duration under Technicolor, Inc. v. Traeger, 57 Haw. 113, 122, 551 P.2d 163[, 170] (1976) and [UARCO].*

3. *Plaintiff suffered irreparable harm and there is no adequate remedy at law.*

4. Plaintiff is entitled to a permanent injunction enjoining Defendant ... from working or otherwise being employed as a [b]riefer in the State of Hawaii for a period of three (3) years from July 31, 2004.

5. *The defense of unclean hands does not bar Plaintiff's claims.*

6. The statute of limitation bars Defendant['s] claims for unpaid salary....

(Emphases added.) (Citations omitted.) [7]

The judgment ordered that (1) Defendant be enjoined from working or otherwise employed as a briefer in the State of Hawai'i [8] for a period of three years from July 31, 2004, (2) judgment be entered on the counterclaim in favor of Defendant and against Plaintiff in the sum of $3,856.03, and (3) costs be awarded in favor of Plaintiff and against Defendant, in the sum of $2,893.29. Defendant appealed from the judgment. Plaintiff does not appeal the judgment entered on the Counterclaim, nor does Defendant appeal the costs awarded in favor of Plaintiff.

## II.

On appeal, Defendant challenges the court's ruling that Plaintiff is entitled to a permanent injunction against Defendant, as well as its determination that Defendant breached the Agreement by continuing to work as a briefer after she left Plaintiff's employ. Defendant argues that (1) Defendant was not a unique or extraordinary employee, (2) salary reductions made the covenant unenforceable, (3) speculative damage is not the same as irreparable injury, and (4)

---

**6.** Having granted Defendant's request for an expedited trial date for the permanent injunction and damages, the court also ordered that no bond or other security was required of Plaintiff.

**7.** In her points of error on appeal, and as discussed *infra*, Defendant challenges the court's March 1, 2005 findings of fact (findings) nos. 15 and 19 and conclusions of law (conclusions) nos. 1 and 2, as well as its May 24, 2005 findings nos.

2, 3, 5, 6, and 8, and conclusions nos. 2, 3, 4, and 5.

**8.** It is noted that although the parties' employment agreement provides that an employee may not work during the times of employment and three years thereafter as a briefer in the County of Honolulu, the judgment stated that Defendant is enjoined from working in such capacity in the State of Hawai'i.

the time restriction is unreasonable. Defendant requests that this court reverse the judgment below; or, in the alternative, reduce the time of the injunction to two months, which is allegedly the time it would take Plaintiff to train a new briefer to replace Defendant.[9]

Plaintiff answers that (1) the training and services provided by Plaintiff were unique and extraordinary, (2) the defense of unclean hands is not a bar to the enforcement of the covenant in the Agreement, (3) Plaintiff suffered irreparable injury because Defendant worked for another briefing company that provided services for the same travel agency with the same customer base as when she was employed by Plaintiff, and (4) the courts have determined that three-year time restrictions of non-competition provisions are reasonable.

Defendant replies that (1) Hawai'i law does not recognize an employer's training to be a legitimate business interest that can be protected by a restrictive employment covenant, (2) unclean hands bars the enforcement of the covenant because the salary provision was part of the consideration of the same agreement, (3) harm suffered by Plaintiff is independent of Defendant's resignation and Defendant did not cause irreparable injury, and (4) the time period is unreasonable because it is longer than required to facilitate Plaintiff's recovery from its loss of Defendant's services.

### III.

 This court reviews the trial court's findings of fact under the clearly erroneous standard. *Bremer v. Weeks,* 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004).

A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed. A finding of fact is also clearly erroneous when the record lacks substantial evidence to support the finding. We have defined substantial evidence as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

*Id.* (citations omitted). The appellate court reviews conclusions of law *de novo,* under the right or wrong standard. *Kienker v. Bauer,* 110 Hawai'i 97, 105, 129 P.3d 1125, 1133 (2006) (citing *Roxas v. Marcos,* 89 Hawai'i 91, 115, 969 P.2d 1209, 1233 (1998)). A conclusion of law is freely reviewable by the appellate court. *Wharton v. Hawaiian Elec. Co.,* 80 Hawai'i 120, 122, 906 P.2d 127, 129 (1995).

 A court's decision to invoke equitable relief, such as the "unclean hands" doctrine, is a matter within its discretion. *See Ueoka v. Szymanski,* 107 Hawai'i 386, 393, 114 P.3d 892, 899 (2005) (stating that "[t]he relief granted by a court [in] equity is discretionary and will not be overturned on review unless the [circuit] court abused its discretion" (quoting *AIG Hawaii Ins. Co. v. Bateman,* 82 Hawai'i 453, 457, 923 P.2d 395, 399 (1996))); *O'Flaherty v. Belgum,* 115 Cal. App.4th 1044, 9 Cal.Rptr.3d 286, 330 (2004) (ruling that a "trial court's decision to grant an equitable defense such as unclean hands is reviewed for abuse of discretion" (citing *Dickson, Carlson & Campillo v. Pole,* 83 Cal.App.4th 436, 99 Cal.Rptr.2d 678, 687 (2000))). "A trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *Sugarman v. Kapu,* 104 Hawai'i 119, 124, 85 P.3d 644, 649 (2004) (quoting *Indus. Mortgage Co. v. Smith,* 94 Hawai'i 502, 511, 17 P.3d 851, 859 (App.2001)).

### IV.

#### A.

 As to Defendant's first issue, as earlier stated, the court found in its May 24, 2005 finding no. 5 that "[t]he training of and the services performed by a briefer are unique." While the parties mention training and services, they only present discernible arguments with respect to training. Hence we discuss only those arguments.

According to Defendant, there was nothing unique or extraordinary about the training

---

**9.** It may be noted that Defendant did not request a stay of the permanent injunction.

she received as evidenced by Laurent's testimony that she trains briefers to "think of [themselves] as the customers or tourists" and to increase the customer's "curiosity" about the products they are selling.[10] Defendant thus maintains that the court erred in its May 24, 2005 finding no. 5. Defendant proposes the test set forth in *Reed, Roberts Assocs. v. Strauman*, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590, 593–94 (1976), which did not specifically involve the issue of training but recognized "the legitimate interest an employer has in safeguarding that which has made his business successful and to protect [an employer] against deliberate surreptitious commercial piracy" and that restrictive covenants concerning the same "will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information." [11]

On the other hand, Plaintiff argues it "has invested and Defendant has been the recipient of the training provided by Plaintiff which has allowed Defendant to provide such unique services on Plaintiff's behalf." Plaintiff adds that "[w]hile the principles which were espoused may be common to all good training programs and services, the technique which Plaintiff has developed was specifically tailored to this type of position which the Plaintiff was solely responsible for developing." Plaintiff cites two Florida cases for the proposition that specialized training is a protectible interest.[12] However, these cases

10. In addition, Defendant relies on *Clark Paper & Mfg. Co. v. Stenacher*, 236 N.Y. 312, 140 N.E. 708 (1923), in support of her position that training is not a protectible interest. In *Clark*, the Court of Appeals of New York reversed a trial court's judgment restraining and enjoining the defendant-employee from working for the employer's competitor. *Id.* at 709. With respect to training, the *Clark* court ruled in the following manner:

> That the defendant has profited by the experience which he obtained in the plaintiff's service may be true. To use this acquired skill elsewhere is no legal wrong. Experience, competency, and efficiency in selling goods are qualifications which can hardly be so rare as to require the aid of equity to prevent an irreparable loss to an employer who finds himself compelled to substitute one salesman for another.

*Id.* at 711. However, at issue in this case is whether specialized or unique training is a legitimate business interest which can be judicially protected by the enforcement of the covenant. The *Clark* court did not address such issue and appeared to speak only of general knowledge acquired through training and experience gained from the plaintiff-employer in that case. Hence, *Clark* is inapplicable.

11. Under *Reed, Roberts Assocs. v. Strauman*, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590, 593–94 (1976), the following rule with respect to the enforcement of restrictive covenants not to compete was enunciated:

> [A] restrictive covenant will only be subject to specific enforcement to the extent that it is [ (1) ] reasonable in time and area, [ (2) ] *necessary to protect the employer's legitimate interests*, [ (3) ] not harmful to the general public and [ (4) ] not unreasonably burdensome to the employee. Undoubtedly judicial disfavor of these covenants is provoked by powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood. Indeed, our economy is premised on the competition engendered by the uninhibited flow of services, talent and ideas. Therefore, no restrictions should fetter an employee's right to apply to his own best advantage the skills and knowledge acquired by the overall experience of his previous employment. This includes those techniques which are but skillful variations of general processes known to the particular trade.
>
> Of course, *the courts must also recognize the legitimate interest an employer has in safeguarding that which has made his business successful and to protect himself against deliberate surreptitious commercial piracy. Thus[,] restrictive covenants will be enforceable to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information. In addition[,] injunctive relief may be available where an employee's services are unique or extraordinary and the covenant is reasonable.*

(Emphases added.) (Internal citations and quotation marks omitted.)

12. *See Aero Kool Corp. v. Oosthuizen*, 736 So.2d 25, 26 (Fla.Dist.Ct.App.1999) (holding that the covenant not to compete involved in that case was reasonable, explaining that under Florida statute § 542.335 (1997), a "legitimate business interest" includes "extraordinary or specialized training"); *Balasco v. Gulf Auto Holding, Inc.*, 707 So.2d 858, 860 (Fla.Dist.Ct.App.1998) (ruling that under the same statute involved in *Aero Kool*, the non-competition provision at issue in that case was "necessary to protect the substantial investment [the employer] makes in specialized training for its sales staff"). Modifications to the common law reasonableness analysis have generally been accomplished through statute. *See, e.g., Vais Arms, Inc. v. Vais*, 383 F.3d 287, 295 (5th Cir.2004) (Texas Covenants Not to Compete Act provides criteria for enforceability of non-competition provisions).

are distinguishable in that Florida provides by statute that such training is a protected interest.[13]

While this court has yet to address whether unique or specialized training is a factor in determining the reasonableness of non-competition clauses, cases from other jurisdictions recognize such a factor. Contrary to Defendant's position that an employer's training was not recognized at common law as a legitimate business interest that needed protection,[14] several jurisdictions have determined otherwise, but only if training is unique in nature and if other factors are present.

In *Vantage Tech., LLC, v. Cross*, 17 S.W.3d 637, 640–44 (Tenn.Ct.App.2000), the employer, a provider of cataract surgery equipment for hospitals in rural areas, requested injunctive relief against its former employee, who was employed as a technician. The employer sought to prevent the employee from working independently as a technician for doctors and hospitals. The employer argued, *inter alia*, that it had a legitimate business interest in the specialized training it provided to the employee, which included the operation of certain medical equipment, attendance at monthly meetings, and assistance in performing cataract surgeries. *Id.* at 643, 646. The trial court concluded that the employee's training was not unique or specialized so as to justify enforcement of the restrictive covenant involved. *Id.* at 646.

On appeal, the Tennessee court did observe that "an employer does not have a protectable interest in the *general* knowledge and skill of an employee." *Id.* at 644–45 (emphasis in original) (citing *Hasty v. Rent–A–Driver, Inc.*, 671 S.W.2d 471, 473 (Tenn.1984)). According to the *Vantage* court, "[t]his is not only true of knowledge and skill brought into the employment relationship, but also true as to that acquired during the employment relationship, even if the employee obtained such general knowledge and skill through expensive training." *Id.* at 645.

However, that court distinguished general knowledge from unique knowledge and skill, explaining that, under the latter, "an employer may have a protectable interest ... at least when such training is present *along with other factors tending to show a protectable interest.*" *Id.* (emphasis added). Thus, "whether an employer has a protectable interest in its investment in training an employee depends on whether the skill acquired as a result of that training is sufficiently special as to make a competing use of it by the employee unfair." *Id.* In addition to the training, the *Vantage* court considered whether (a) trade secrets and confidential information were divulged, and (b) special customer relationships were affected. *Id.* at 644–46. Ultimately, after determining that confidential information and special customer relationships were at stake in that case, the

**13.** Florida Statutes § 542.335(b) (1997), entitled "Valid restraints of trade and commerce," protects through restrictive covenants a person's "legitimate business interest" including, but not limited to the following:

 1. Trade secrets....
 2. Valuable confidential business or professional information that otherwise does not qualify as trade secrets.
 3. Substantial relationships with specific prospective or existing customers, patients, or clients.
 4. Customer, patient, or client goodwill associated with:
 a. An ongoing business or professional practice, by way of trade name, trademark, service mark, or "trade dress";
 b. A specific geographic location; or
 c. A specific marketing or trade area.
 5. *Extraordinary or specialized training.*
(Emphasis added.)

**14.** In her reply brief, Defendant argues that the fact of training itself is not a basis for granting

an injunction. (Citing 42 Am.Jur.2d *Injunctions* § 137 (2000) (stating that "[t]he fact that a former employee was trained by an employer is not a basis for granting an injunction enforcing a restrictive noncompetition covenant against the employee"); *USAchem Inc. v. Goldstein*, 512 F.2d 163, 167 n. 4 (2d Cir.1975) (noting that "the fact that a former employee was trained by an employer is not a basis for granting an injunction enforcing a restrictive covenant"); *Kidde Sales & Serv., Inc. v. Peairson*, 493 S.W.2d 326, 330 (Tex. Civ.App.1973) (noting "[t]hat a former employee was trained by the employer is not a ground for enforcing a restrictive covenant not to compete, even if the training was complex and extensive"); *Clark Paper*, 140 N.E. at 711 (holding that the skills learned by employer in connection with sales of wrapping paper was not a protectible interest)). However, the authorities cited by Defendant do not hold that unique or specialized training is non-protectable.

appellate court held that "the totality of all of this amounts to a legitimate business interest properly protectable by a covenant not to compete." *Id.* at 646.

Specialized or unique training, as distinguished from general skills, have also been ruled to be protectable but not present in *Moore Bus. Forms, Inc. v. Foppiano,* 181 W.Va. 305, 382 S.E.2d 499 (1989). In that case, the employer sought an injunction preventing the employee from engaging in the occupation of selling business forms in a specified area for a period of two years, as proscribed by the parties' employment contract. *Id.* at 500. The trial court found that the employee violated a covenant not to compete. *Id.* The employee argued on appeal that the restrictive covenant was unreasonable and unenforceable, and the Supreme Court of West Virginia agreed. *Id.*

It was determined that the employee was sent to a training school for a two or three week period, where he became familiar with the employer's product line and sales techniques. *Id.* Following his training, the employer was assigned to a sales area and was given additional on-the-job training. *Id.* The employee eventually left the employer and opened his own business. *Id.* at 501. He then solicited orders from the employer's former customers within the same area to which he had been formerly assigned. *Id.*

The *Moore* court held that the employer did not provide any unique or specialized training, and stated as follows:

> In the case at bar, we do not believe that the employer has met its burden of demonstrating a legitimate business interest warranting the protection of the restrictive covenant. The evidence did not show that Moore provided the defendant with any unique or specialized training in the course of his employment. We have stated [that] … *"[w]hen the skills and information acquired by a former employee are of a general managerial nature, such as supervisory, merchandising, purchasing and advertising skills and information, a restrictive covenant in an employment contract will not be enforced because such skills and information are not protectible employer interests."*

*Id.* at 501–02 (quoting *Helms Boys, Inc. v. Brady,* 171 W.Va. 66, 297 S.E.2d 840, 843 (1982)). It was also determined that the employer failed to prove that the employee had access to "confidential information such as knowledge of product prices, customer lists, customer reorder cycles, customer inventory rooms, and company profit margins[,]" and that "virtually all of the information [the employer] considered confidential either was available to other employees … through the [employer's] own publications or was ascertainable by independent sources." *Id.* at 502. The *Moore* court also stated that the employer "failed to demonstrate that the [employee] appropriated the 'good will' of his former employer." *Id.* The *Moore* court then reversed the trial court's ruling in granting judgment in favor of the employer.

■ Other cases similarly suggest that specialized or unique training may be protectible when a factor such as the confidentiality of business information is present and at stake. *Compare Gill v. Guy Chipman Co.,* 681 S.W.2d 264, 269 (Tex.App.1984) (upholding a non-competition covenant after noting that employer "extensively trained prospective managerial employees in all of its methods of operating a real estate office … [including] imparting to them training and knowledge specifically useful to them or a competitor against [the employer which] would not have been available to [employee] except by virtue of her being a manager with [employer]" and that "confidential business information has in fact been imparted to an employee") *with Boisen v. Petersen Flying Serv.,* 222 Neb. 239, 383 N.W.2d 29, 34 (1986) (affirming denial of injunctive relief after observing that the training given to employee was "no different from that which would have been received from another employer" engaged in the same business). *See also Restatement of Contracts* § 516 comment h (1932) (noting that, in general, "[a] promise of a former employee will not ordinarily be enforced so as to preclude him from exercising skill and knowledge acquired in his employer's business, even if the competition is injurious to the latter," but that such a restriction can be enforced "*so far as to prevent the use of trade secrets or lists of*

*customers, or unless the services of the employee are of a unique character*" (emphasis added)). Hence, as a matter of law, we hold that training that provides skills beyond those of a general nature is a legitimate interest which may be considered in weighing the reasonableness of a non-competition covenant, when combined with other factors weighing in favor of a protectable business interest such as trade secrets, confidential information, or special customer relationships.[15]

Under the circumstances of the instant case, it cannot be said that the court's May 24, 2005 finding no. 5 was clearly erroneous in stating that "[t]he training of . . . a briefer [is] unique." At trial, Laurent testified such specialized training included the use of a prepared script for the presentation of information for products and services known only by Plaintiff, on the job critiquing by Laurent, and continuous training throughout the employment period. Laurent testified that she is the one who provides all training on behalf of Plaintiff.

The training consisted of various components including memorization of scripts, question and response instruction, and practice presentations. Laurent asserted that there is a distinction between a briefer and a sales person or sales clerk because of the difference in expertise. Laurent does not require her sales clerks to sign agreements containing non-competition provisions. Laurent also confirmed that she restricts who can attend sales presentations because there is "something secret" about her style of sales presentation. Laurent also claimed that her techniques were specially designed and solely developed by her over a number of years and has not been utilized by other companies providing briefing services.

The chief operation officer of H.I.S., John Shortridge (Shortridge), testified that, as a result of his company's use of Defendant's services, his company experienced "[t]remendous sales" and that Defendant was able to generate approximately one million dollars a month in average gross sales.

Hence, the record indicates that Defendant received extensive training, specially designed by Laurent and proprietary to Plaintiff's business in providing briefing services, and that such training primarily consisted of information that was confidential in nature. As a briefer with Plaintiff, Defendant initiated a relationship with H.I.S. which she eventually utilized by providing briefing services for H.I.S., seemingly at Plaintiff's expense. As a result of such training, the services provided by Defendant to H.I.S. resulted in a significant increase in H.I.S. sales. Viewed in toto, these factors provide a reasonable basis for the court to have concluded, in effect, that a "legitimate business interest properly protectable by a covenant not to compete[,]" *Vantage Tech.*, 17 S.W.3d at 646, was present in this case.

Accordingly, we cannot conclude that the court's May 24, 2005 finding no. 5 that the training of a briefer was unique was wrong as a matter of law or clearly erroneous in light of the evidence in the record.

### B.

With respect to Defendant's challenge to the March 1, 2005 finding no. 15 that "Defendant continued to sell optional tours and gift packages for [H.I.S.]" in the same manner as when she was employed with Plaintiff, no error exists. At trial, Laurent testified that she saw Defendant providing briefing for H.I.S. Shortridge testified that Defendant did briefing for H.I.S., and Defendant herself stated that she sold tour packages to H.I.S. Therefore, the March 1, 2005 finding no. 15 was not clearly erroneous, as substantial evidence existed to warrant that finding.

### V.

 As to her second issue, Defendant argues that Plaintiff's failure to pay her full base salary renders the covenant unenforceable, because of lack of consideration, or under the doctrine of "unclean hands." Based on this assertion, Defendant challenges the court's (a) March 1, 2005 finding no. 19, that

---

**15.** Inasmuch as the reasonableness and enforceability of covenants not to compete are analyzed on a "case-by-case" basis, *Pierson v. Med. Health* *Ctrs., P.A.,* 183 N.J. 65, 869 A.2d 901, 904 (2005), the factors listed are not intended to be exhaustive.

"Plaintiff continued to pay Defendant her full base salary after the 9–11 terrorist incident," (b) May 24, 2005 finding no. 6 that "Defendant acquiesced to the reduction in her salary and did not terminate her employment with Plaintiff at that time despite having grounds to do so," (c) May 24, 2005 finding no. 8 that "Plaintiff's conduct in not paying Defendant her full salary does not amount to unclean hands," and (d) May 24, 2005 conclusion no. 5 that "[t]he defense of unclean hands does not bar Plaintiff's claims."

In this regard, Defendant maintains that salary reductions are directly connected to the covenant because salary and commissions were the consideration upon which the Agreement was based. However, Plaintiff asserts that Defendant acquiesced in the reductions, thus severing the connection between salary reductions and the covenant.

### A.

With respect to subpoint (a), it appears that Defendant is correct in that the court erred in finding that "Plaintiff continued to pay Defendant her full base salary after the 9–11 terrorist incident" in the March 1, 2005 finding no. 19. The record lacks substantial evidence to support this finding.[16] Plaintiff agrees in its brief that Defendant did not receive her full salary following the 9–11 incident because of what Plaintiff called "across the board" pay cuts. Therefore, this finding is clearly erroneous and must be vacated. However, this finding has no effect on the court's rejection of the defense of unclean hands.

### B.

As to Defendant's challenge to the court's May 24, 2005 finding no. 6 in subpoint (b), although Defendant contests this finding, Defendant offers no rationale in either her opening or reply briefs to support error in this finding. Moreover, as earlier mentioned, Laurent testified that Defendant did not object to any reduction. Defendant neither rebutted this testimony nor offered any evidence to the contrary. Accordingly, this finding was not clearly erroneous.

### C.

The court's May 24, 2005 finding no. 8, that "Plaintiff's conduct in not paying Defendant ... her full salary does not amount to unclean hands[,]" although entered as a finding, must be deemed a conclusion of law. Defendant contends that the court erred in this regard because a salary is a material element of the contract, thus amounting to unclean hands with regard to the Agreement. Plaintiff responds by arguing that although the defense of unclean hands may have been a legitimate defense during the time period when Defendant's salary was reduced, because such time period covering the reduction in salary occurred over two years earlier, it no longer constituted a viable defense. The court orally ruled that "in light of the fact that there was in essence acquiescence to the change in base pay and that the Defendant chose not to terminate the employment agreement, even though she had the option and ability to do so under the terms of the agreement itself, that change in payment of base salary does not amount to unclean hands."

▬▬▬ This court has limited the doctrine of "unclean hands," or the equitable maxim "he who comes into equity must come with clean hands," in the following manner:

> Broad as the principle is in its operation, it must still be taken with reasonable limitations; it does not apply to every unconscientious act or inequitable conduct on the

---

16. The court cites the trial transcript as evidence for this finding; however, when read with the surrounding context it does not appear that this finding is correct. Laurent stated that everyone received a pay cut after the "9–11" incident but Defendant received her full salary several months thereafter:

> Q. And, was she receiving that two thousand dollar salary for several years prior to her leaving?

> A. The only time everybody took a cut in pay was the 9/11 terroristic incident several months after that, but, other than that, everybody went back to their base salary thereafter

> Q. So, Miss Laurent, after ... 9/11 Miss Del Rosario was receiving her same base salary of two thousand dollars a month; is that correct?

> A. Yes.

part of a plaintiff. *The maxim, considered as a general rule controlling the administration of equitable relief in particular controversies, is confined to misconduct in regard to, or at all events connected with, the matter in litigation, so that it has in some measure affected the equitable relations subsisting between the two parties, and arising out of the transaction;* it does not extend to any misconduct, however gross, which is unconnected with the matter in litigation, and with which the opposite party has no concern. When a court of equity is appealed to for relief it will not go outside of the subject matter of the controversy, and make its interference to depend upon the character and conduct of the moving party in no way affecting the equitable right which he asserts against the defendant, or the relief which he demands.

*Woodward v. Auyong,* 33 Haw. 810, 811–12 (1936) (emphasis added). It has also been stated by this court that the clean hands doctrine "is not one of absolutes, and each case must be judged on its particular facts and circumstances." *Shinn v. Edwin Yee, Ltd.,* 57 Haw. 215, 230–31, 553 P.2d 733, 744 (1976) (citing *Keystone Driller Co. v. Gen. Excavator Co.,* 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933)).

Under the circumstances of this case, it does not appear the court abused its discretion in determining that "Plaintiff's conduct in not paying Defendant … her full salary does not amount to unclean hands." First, Defendant knew about the covenant at the time she signed the Agreement. There is no evidence that Plaintiff unfairly imposed such provision upon her. Defendant never contended that the reduction in her salary caused her to breach the covenant.

Second, as determined by the court in its May 24, 2005 finding no. 6, "Defendant acquiesced to the reduction in her salary and did not terminate her employment with Plaintiff at that time despite having grounds to do so." Laurent testified that when Defendant reduced her salary starting in 1997, Defendant "[n]ot even once" objected to the reduction. Defendant only raised the objection of "unclean hands" as a defense to Plaintiff's claim for injunctive relief in 2004.

Apparently, based on Laurent's testimony, the court entered its unchallenged March 1, 2005 finding no. 18, that "Defendant did not object to the salary reduction." *See Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 117, 839 P.2d 10, 28 (1992) (noting that "[a]n appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trial judge"). Defendant proffered no reason at trial as to why she apparently acquiesced in the reduction. Hence, the court could conclude that Plaintiff's reduction of Defendant's salary at certain times between 1997 and 2000 was not sufficiently connected with Defendant's breach of the covenant so as to have "affected the equitable relations subsisting between the parties." *Woodward,* 33 Haw. at 811–12. Under the evidence, it cannot be concluded as a matter of law that the court "clearly exceed[ed] the bounds of reason or disregard[ed] rules or principles of law or practice to the substantial detriment of a party litigant," *Sugarman,* 104 Hawai'i at 124, 85 P.3d at 649, on this issue. Having ruled that the reduction in salary did not amount to "unclean hands" in light of Defendant's apparent acquiescence, it was within the court's discretion to deny equitable relief under the "unclean hands" doctrine.

## VI.

As to her third issue, Defendant argues that Plaintiff failed to satisfy its burden of showing irreparable injury. Defendant asserts that "speculative damage is not the same as irreparable injury," and that Laurent could only speculate as to what her "irreparable injury" was. Plaintiff adds that no irreparable injury exists inasmuch as (a) Plaintiff has … other briefers, who were more productive than Defendant[,] (b) Plaintiff "wasn't … using Defendant that much," (c) Plaintiff "sent Defendant to smaller groups in the last two years of her employment, because of Defendant's poor sales performance," and (d) Plaintiff never attempted

to replace Defendant.[17] As such, Defendant contends that the court erred in its May 24, 2005 findings nos. 2 and 3, and its May 24, 2005 conclusion no. 3. *See infra.*

### A.

As to the court's May 24, 2005 finding no. 2, that "Plaintiff has and will suffer a loss of customers or clients as a result of Defendant leaving Plaintiff's employ and working elsewhere as a briefer," Defendant maintains that in June 2004, she decided to leave Plaintiff after learning that H.I.S. was going to stop using Plaintiff. Defendant asserts, therefore, that the harm resulting from H.I.S. terminating its relationship with Plaintiff was not a consequence of Defendant leaving, but stemmed from "many complaints," *see supra* note 5, and because of a change in the presidency of H.I.S.

On the other hand, during the trial, Laurent testified that H.I.S. desired that one of Plaintiff's briefers quit so that H.I.S. could cease working with Plaintiff and hire her former briefer. According to Plaintiff, H.I.S. would not have stopped using Plaintiff's services but for Defendant's resignation. Thus, Plaintiff contends, Defendant's violation of the covenant did result in injury to Plaintiff. It appears that the court found credible Laurent's contention that H.I.S. ceased using Plaintiff's services as a result of Defendant's resignation. In light of the evidence adduced it cannot be concluded the court was clearly erroneous in its May 24, 2005 finding no. 2. *See Amfac,* 74 Haw. at 117, 839 P.2d at 28 (noting that "[a]n appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trial judge").

### B.

Defendant also contends that the court erred in its May 24, 2005 finding no. 3, that "[i]t is difficult to measure the damages suffered by Plaintiff as a result of Defendant leaving Plaintiff's employ and working elsewhere as a briefer." However, Defendant does not present argument opposing this finding except to say that Plaintiff did not suffer harm as a result of the loss of Defendant. There being no discernable argument, we do not consider it. *See Norton v. Admin. Dir. of Court,* 80 Hawai'i 197, 200, 908 P.2d 545, 548 (1995) (stating that this court may disregard a contention where no discernable argument was made on appeal (citing *Hall v. State,* 10 Haw.App. 210, 218, 863 P.2d 344, 348, *cert. denied,* 76 Hawai'i 246, 75 Haw. 581, 868 P.2d 464 (1993))). Thus, this finding will not be vacated. Inasmuch as the court's May 24, 2005 conclusion no. 3 to the effect that "Plaintiff suffered irreparable harm and there is no adequate remedy at law" is dependent on its May 24, 2005 finding no. 3, it cannot be said that the court was wrong in making such conclusion.

### VII.

Defendant, in her fourth issue, argues that because Defendant's initial training period lasted two months, "the duration of the injunction must be tailored to that period of time that is necessary to enable Plaintiff to recover from its loss of Defendant; *i.e.,* how long it would take for Plaintiff to replace

---

**17.** Plaintiff argues that it suffered irreparable harm, citing in support this court's definition of "irreparable damage" in *Klausmeyer v. Makaha Valley Farms, Ltd.,* 41 Haw. 287, 339–40 (1956), which stated as follows:

> [A]n injury is irreparable, within the law of injunctions, where it is of such a character that a fair and reasonable redress may not be had in a court of law, so that to refuse the injunction would be a denial of justice; where, in other words, from the nature of the act, or from the circumstances surrounding the person injured, or from the financial condition of the person committing it, *it cannot be readily, adequately, and completely compensated for with money. The term "irreparable damage"*

> *does not have reference to the amount of damage caused, but rather to the difficulty of measuring the amount of damages inflicted.*

(Emphasis added.) Defendant does not dispute on appeal that H.I.S. was Plaintiff's primary client. According to Plaintiff, the fact that Defendant began working for H.I.S., Plaintiff's primary client, after leaving employment with Plaintiff is sufficient to demonstrate irreparable harm because the amount of harm is difficult to ascertain. Plaintiff thus asserts that inasmuch as it demonstrated irreparable injury as defined under *Klausmeyer,* the court correctly concluded that Plaintiff suffered irreparable harm, and there was no adequate remedy at law.

her." In support of this proposition, Defendant cites to *Maltby v. Harlow Meyer Savage, Inc.,* 166 Misc.2d 481, 633 N.Y.S.2d 926, 930 (Sup.1995), where it was held that a period of six months was reasonable "because that is the amount of time [the employer] needs to recover from [the employees'] departure; it is not unduly long so as to cause permanent injury or loss of ability to earn a livelihood." On the other hand, Plaintiff maintains that, as indicated by the holdings in *Traeger* and *UARCO,* two and three year non-competition clauses have been determined to be reasonable.

Defendant's citation to *Maltby* is unpersuasive. *Maltby* considered the six-month covenant in that case to be reasonable inasmuch as six months was required for the employer to recover from the employee's departure, and not the amount of time it took to replace an employee. Thus, the amount of time necessary to replace an employee is not necessarily determinative of the reasonable length of time an injunction should remain in effect with respect to non-competition provisions. Rather, in determining reasonableness as to time, what is required of the courts is to determine whether the time period for the injunction is reasonable, as discussed *infra.*

The court concluded that the covenant was reasonable in scope and duration in its March 1, 2005 conclusion no. 1, that "[t]he [covenant] was reasonable in scope and duration," and its May 24, 2005 conclusion no. 2, that "[t]he [covenant] was reasonable in scope and duration under [*Traeger*] and [*UARCO*]."

█ In *Traeger,* this court stated that the reasonableness of a restrictive covenant in a post-employment context is determined by using a "reasonableness analysis." 57 Haw. at 121, 551 P.2d at 170. As observed in *Traeger,* courts will find a non-competition provision unreasonable if " '(i) it is greater than required for the protection of the person for whose benefit it is imposed; (ii) it imposes undue hardship on the person restricted; or (iii) its benefit to the covenantee is outweighed by injury to the public.' " *Id.* (quoting Harvey J. Goldschmid, *Antitrust's Neglected Stepchild: A Proposal For Dealing With Restrictive Covenants Under Fed-*

*eral Law,* 73 Colum. L.Rev. 1193, 1196 (1973)). Such a "reasonable analysis" is performed by the court "as a matter of law[.]" *Id.* A court "must examine such factors as geographical scope, length of time, and breadth of the restriction placed on a given activity." *Id.*

While *Traeger* did not specifically apply the three-factor analysis as to time, at least one commentator has noted that the same analysis is used to determine the reasonableness of time. *See* C.T. Drechsler, Annotation, *Enforceability of Restrictive Covenant, Ancillary to Employment, as Affected by Duration of Restriction,* 41 A.L.R.2d 15 (1955) (observing that three requirements need to be met in determining the reasonableness of a time limitation, in that the restraint as to time must "(1) . . . be necessary in its full extent for the protection of the legitimate interests of the employer[,]" "(2) . . . not be so large as to injure the employee by precluding [the employee] from pursuing [his or her] occupation and thus preventing [him or her] from supporting himself [or herself] and family[,]" and "(3) . . . not be so large as to interfere with the interests of the general public by depriving it of the restricted party's industry or services").

With respect to the first factor, it cannot be concluded that the court was wrong as a matter of law in ruling that a three-year period is reasonable. Laurent's uncontroverted testimony stated that Plaintiff was the first company to offer briefing services, and that Plaintiff developed a method of "briefing" over a number of years. Plaintiff guarded that method and certain techniques from third parties and regarded the method, and the position of a briefer as "unique."

Upon the end of her employment, Defendant ventured into her own briefing services company and provided services to Plaintiff's primary client. The value of Defendant's services may be reasonably traced to her experiences with Plaintiff. Defendant's contact with H.I.S. also arises from her employment with Plaintiff. A three-year period may be reasonable under the circumstances for the protection of Plaintiff's interest in its business. *See Eastman Kodak Co. v. Powers Film Prods.,* 189 A.D. 556, 179 N.Y.S. 325,

330 (1913) (where employee learned certain skills in connection with the manufacture of photographic film, a two-year period was held reasonable inasmuch as the "lapse of time will have developed still further improvements and changes, such as would render the knowledge now possessed by [the employee] more or less ineffectual in harm of the [employer]").

As to the second factor, it cannot be said that the three-year period is unreasonable so as to preclude Defendant from pursuing an occupation or prevent her from supporting her family. At the hearing on the motion for preliminary injunction, Defendant testified on cross-examination that she understood that she was precluded from working as a briefer for a three-year period following her resignation.[18] At the time she left Plaintiff's employ, Defendant was able to work first as a bus driver, then as a hair and makeup person. Defendant did not adduce evidence that the covenant would impose a hardship on her or her family.

As to the third factor, this court cannot discern an injury to the public by the court's enforcement of the three year injunction at issue. It appears that the services of a briefer is of primary benefit to a small number of commercial enterprises and such services are currently being provided by Plaintiff and two other companies. Hence, the evidence satisfying all three factors, it cannot be said that, as a matter of law, the court was wrong in its March 1, 2005 conclusion no. 1 or its May 24, 2005 conclusion no. 2 determining the time period was reasonable.

## VIII.

Accordingly, we affirm the court's May 24, 2005 judgment and July 11, 2005 amended judgment, except with respect to finding no. 19 [19] and insofar as the court erroneously ordered that Defendant be enjoined from working as a briefer in the State of Hawai'i. The case is remanded to the court to amend its judgment to reflect that the injunction involved herein is limited to the County of Honolulu.

---

18. Defendant testified that she was also under the impression that she was precluded from working as a tour guide for the same three-year period in the event her employment with Plaintiff would terminate.

19. *See supra* Section V.A.