**Electronically Filed
Supreme Court
SCWC-16-0000890
01-APR-2022
09:15 AM
Dkt. 96 AMOP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

PRUDENTIAL LOCATIONS, LLC,
Respondent/Plaintiff-Appellant,

vs.

LORNA GAGNON and PRESTIGE REALTY
GROUP LIMITED LIABILITY COMPANY,
Petitioners/Defendants/Cross-Claim Defendants-Appellees,

and

RE/MAX LLC and LORRAINE CLAWSON,
Respondents/Defendants/Cross-Claimants/
Third-Party Plaintiffs-Appellees,

and

KEVIN TENGAN,
Respondent/Third-Party Defendant-Appellee.

_____

SCWC-16-0000890 and SCWC-17-0000216

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000890 & CAAP-17-0000216; CIV. NO. 13-1-2328)

APRIL 1, 2022

McKENNA AND WILSON, JJ., AND CIRCUIT JUDGE MORIKAWA, ASSIGNED BY
REASON OF VACANCY, WITH RECKTENWALD, C.J., CONCURRING IN PART
AND DISSENTING IN PART, WITH WHOM NAKAYAMA, J., JOINS

1

AMENDED[1] OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

This case addresses the enforceability of a non-compete agreement restricting Lorna Gagnon ("Gagnon"), a former employee of Prudential Locations, LLC ("Locations"), from "establishing her own brokerage firm in the State of Hawai'i within one year after terminating her employment with Locations" and from soliciting persons "employed" or "affiliated with" Locations. At issue are two restrictive clauses within the non-compete agreement:  a non-compete clause and a non-solicitation clause.

We hold as follows:  (1) the ICA erred in failing to address whether the non-compete and solicitation clauses were ancillary to a legitimate purpose not violative of HRS Chapter 480, as required by HRS § 480-4(c) (Supp. 2015); (2) restricting competition is not a legitimate ancillary purpose, as HRS § 480-4(a) prohibits contracts in restraint of trade or commerce in the State; (3) to establish a violation of a non-solicitation clause, there must be evidence that the person subject to the solicitation clause actively initiated contact; and (4) summary judgment was properly granted in favor of Gagnon as to the non-compete clause, but summary judgment should not have been granted for one agent as to the non-solicitation

---

[1]     This opinion has been amended to change only the final paragraph.

2

clause due to a genuine issue of material fact regarding whether Gagnon actively initiated contact.

We therefore vacate the Intermediate Court of Appeals' ("ICA") July 2, 2020 judgment on appeal and the Circuit Court of the First Circuit's ("circuit court") December 9, 2016 final judgment in favor of Gagnon and remand to the circuit court only with respect to the alleged breach of the solicitation clause as to one agent. We otherwise affirm the judgments of the ICA and the circuit court.

## II. Background

Locations is a real estate brokerage firm with offices in Kapahulu, Pearlridge, Mililani, Kailua, and Kapolei. Gagnon worked as a real estate salesperson in New Hampshire from 1989 and later became a licensed real estate broker in 1999. Gagnon had previously owned an independent brokerage business, and from 2003 to 2008, she owned and operated a RE/MAX real estate franchise in New Hampshire.

In 2008, Gagnon moved to Hawai'i after interviewing with Locations while on the mainland, then accepted a "sales coach" position with Locations. On August 8, 2008, Gagnon signed a "Confidentiality and Non-Competition Agreement." The Confidentiality and Non-Competition Agreement contained four parts: (1) recitals; (2) confidentiality and proprietary rights; (3) agreement not to compete ("Non-Compete Agreement");

3

and (4) remedies of company.  The Non-Compete Agreement was comprised of non-compete and non-solicitation clauses.  In summary, the clauses prohibited Gagnon from establishing her own brokerage firm in the State of Hawai'i and from soliciting other persons affiliated with Locations to terminate their affiliations to work with her.  The clauses prohibited these acts for a one-year period after her employment termination.

The Confidentiality and Non-Compete Agreement provided as follows:

CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

THIS CONFIDENTIALITY AND NON-COMPETITION AGREEMENT (the "Agreement"), is made and entered into as of the date set forth below, by and between Prudential Locations Real Estate, LLC, a [Hawai'i] limited liability company, the employer described below ("Company") and the employee described below ("Employee").

1.    Recitals.

1.1 The primary business of the Company is to provide real estate brokerage and/or property management services in the State of [Hawai'i], hereinafter collectively referred to as the "Business."

1.2 The Business involves confidential and proprietary information and procedures and trade secrets of the Company and its subsidiaries, and such Information is a special, valuable and unique asset of the Business.

1.3 Employee is employed by the Company and will have access to such confidential and proprietary information, procedures and trade secrets of the Company.

1.4 Employee, in consideration of future employment, agrees to enter into this Agreement for the protection of the Business.

NOW, THEREFORE, the parties hereto, intending to be legally bound hereby, do promise and agree as follows:

2. Confidentiality and Proprietary Rights.  Employee acknowledges and agrees that he or she will have access to confidential and proprietary information and procedures and

4

trade secrets of the Company and its subsidiaries, and that such information is a special, valuable and unique asset of the business of the Company and its subsidiaries. Employee further acknowledges and agrees that such confidential and proprietary information and procedures and trade secrets belonging exclusively to the Company includes, without limitation, the following: (i) any information which is not generally developed, made or obtained by the Company or any of its subsidiaries or which otherwise came into possession of the Company or any of its subsidiaries, (ii) all memoranda, files, books, papers, letters, drawings, documents, formulas, specifications, investigations, and other processes data, and all copies thereof and therefrom, in any way relation to the Company or any of its subsidiaries, whether used, developed, made or obtained by the Company or any of its subsidiaries or which otherwise came into the possession of the Company or any of its subsidiaries, (iii) all information related to clients and customers, including without limitation, clients and customer lists, and identities of existing, past and prospective clients and customers, prices charged or proposed to be charged to any existing, past and prospective client or customer, client or customer contacts, special customer requirements, and all related information; (iv) sales and marketing strategies, plans, materials and techniques, research and development information, trade secrets and other know-how or other information pertaining to the financial condition, business, research and development or prospects of the Company or any of its subsidiaries; and (v) patterns, devices, compilations of information, copyrightable material and technical information, if any, in any way relating to the Company or any of its subsidiaries (hereinafter collectively referred to as the "Confidential Information").

2.1 <u>Restriction on Use of Confidential Information.</u> Employee agrees that, except in performance of duties under an employment arrangement with the Company, Employee shall not directly or indirectly, at any time or place, during his or her employment and at anytime after Employee ceases to be an employee for any reason whatsoever, use for his or her own benefit or for the benefit of any third party, or disclose to any third party, any Confidential Information acquired by reason of his or her status as an employee or former employee of the Company, including without limitation, Confidential Information belonging or relating to the Company or its subsidiaries, affiliates and customers. Employee agrees that the duration, geographic area and scope of this provision is reasonably necessary for the protection of the Company and does not and will not impose undue hardship on Employee.

3. <u>Agreement Not To Compete</u>. Employee agrees that Employee <u>shall not</u>, directly or indirectly, within the State of Hawaii where the Company conducts or has conducted

business, during his or her employment and for a period of one (1) year after Employee ceases to be an employee for any reason whatsoever, (i) represent, furnish consulting services to, be employed by, or engage or participate in the same or similar business, or perform services for third parties which are generally comparable or competitive with those performed by the Company with respect to the Business ("Comparable Services"), (ii) own or operate, or become proprietor, partner, principal, agent, consultant, employee, trustee, director, officer, stockholder or investor, of any person, firm or business which engages or participates in the same or similar business or businesses conducted by the Company, including without limitation, the Business, or which performs Comparable Services, (iii) engage in any activity or conduct adverse to the Business or Interests of the Company, or (iv) induce or encourage any other persons employed or affiliated with the Company to terminate their relationship with the Company. <u>Notwithstanding the foregoing, Company agrees that the Employee may, independently or as an employee or independent contractor of an existing real estate brokerage company act as a real estate salesperson or broker/salesperson, and such conduct shall not constitute a violation of this paragraph (the "Permitted Activities"). Permitted Activities however shall not include (i) Employee's formation of a real estate brokerage company with other real estate salesperson(s), (ii) Employee's solicitation of other persons employed or affiliated with the Company.</u>

(Emphasis in original.)

In June 2013, Gagnon terminated her employment with Locations, and in August 2013, she opened a new RE/MAX franchise in Hawai'i called Prestige Realty Group, LLC ("Prestige"). A few Locations real estate agents also left Locations to open Prestige.

## A. Circuit court proceedings

Locations filed a complaint in the circuit court against Gagnon and Prestige on August 23, 2013, claiming Gagnon violated the Non-Compete Agreement by establishing Prestige and soliciting Locations' agents.

6

After discovery, Locations filed a motion for partial summary judgment seeking enforcement of the Non-Compete Agreement. Locations contended the Non-Compete Agreement was tailored to its legitimate business interests, and that Gagnon had acknowledged the reasonableness of its duration, scope, and geographic area by signing it. Locations asserted it had a legitimate interest in protecting confidential business information and preventing "its managerial personnel from taking actions harmful to its business, such as forming a competing real estate brokerage firm and poaching Locations' agents."

Locations acknowledged that: (1) pursuant to Technicolor, Inc. v. Traeger, 57 Haw. 113, 122, 551 P.2d 163, 170 (1976), a non-compete clause must protect a legitimate business interest and be reasonable; and (2) to be reasonable, a non-compete clause must not: (a) be "greater than required for the protection of the person for whose benefit it is imposed[;]" (b) "impose undue hardship on the person restricted[;]" (c) have a "benefit to the covenantee [that] is outweighed by injury to the public[.]" Locations claimed enforcing the non-compete clause against Gagnon was necessary because she had access to "technologies and techniques" tailored to Locations and its "website-related technology that provides analysis and reports concerning preferences of its consumers."

7

Locations also maintained the Non-Compete Agreement did not impose undue hardship on Gagnon because it only prevented her from starting a brokerage firm that would compete with Locations, but it did not restrict her from working for an already existing firm.

Locations also contended Gagnon violated the non-solicitation clause, citing Gagnon's deposition testimony regarding conversations in which Locations' former agents expressed interest in joining Gagnon after learning she was leaving Locations.

Gagnon filed a memorandum in opposition to Locations' motion for partial summary judgment and a cross-motion for summary judgment. Gagnon contended that through the deposition testimony of William Chee ("Chee") and Dan Tabori ("Tabori"), Locations' President and Vice-President of Business Operations, Locations admitted the sole purpose of the Non-Compete Agreement was to prevent new competition, thereby restricting trade and commerce in violation of HRS § 480-4(a).[2] Gagnon cited Chee's statement that, "when someone goes out and starts their own firm, it provides a bigger threat to our company, which we're trying to protect against," and Tabori's testimony that, "we

_____

[2]    HRS § 480-4(a) provides:  "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State is illegal."

want to make sure that we don't bring people on who learn what we do and then go ahead and start their own company."

Furthermore, Gagnon pointed out that of the eighteen coaches employed by Locations, only some were bound by non-compete agreements, and Locations' executives, including Tabori, were not under non-compete covenants.  Gagnon argued that if employees and managers with similar or more access to confidential information than her were not restricted by non-compete agreements, then Locations had no legitimate interest in the Non-Compete Agreement with her.

Gagnon alternatively argued that if there was a legitimate interest, the non-compete clause was unreasonable because it encompassed the entire State of Hawai'i, was unduly burdensome because her only source of income came from Prestige, and it limited the public's ability to choose a provider of real estate services.  Gagnon also maintained with respect to the non-solicitation clause that she did not solicit any of Locations' agents and, because Locations' agents were independent contractors, they were not "employees" or "persons affiliated with" Locations under the clause.

The circuit court held a hearing on the parties' motions for summary judgment on August 3, 2016.[3]  Locations maintained it

_____

[3]    The Honorable Karl K. Sakamoto presided.

had a legitimate interest in protecting its confidential information. However, Locations admitted the Non-Compete Agreement did not mention confidentiality and that it "didn't move [for summary judgment] on whether Ms. Gagnon used confidential material or misappropriated confidential material." Locations argued that, even without evidence that Gagnon used any of its confidential information, Gagnon violated the Non-Compete Agreement.

On August 25, 2016, the circuit court issued its findings of fact ("FOFs"), conclusions of law ("COLs"), and orders denying Locations' motion for partial summary judgment and granting Gagnon's cross-motion for summary judgment. The circuit court's findings included the following:

> 33. Locations has produced no evidence that Defendants were in possession of and had been using any confidential or proprietary information, or any trade secrets of Locations.
> 34. Locations does not contend that any of the Defendants are using any technology, concept, method, training or idea of Locations.
> 35. Locations does not dispute that there was no trade secret violation.
> 36. All coaches at Locations have access to the same information at Locations.
> . . . .
> 39. At least six noncompete agreements were in effect at any one time for persons with the same access to the same information, with the same job description, the same responsibilities, and the same geographic scope.
> 40. Former and current employees and managers at Locations, including other sales coaches, were and currently are not bound by or party to any non-compete agreement.
> 41. Of the 18 coaches, some were bound to one of the 6 versions of non-compete agreements and some were not bound by any non-compete restriction.
> . . . .
> 48. Ms. Gagnon could take all that she knew or learned while at Locations and could work independently as an

employee or independent contractor for an existing real estate brokerage firm in Hawai'i.

49. At present, Ms. Gagnon's only means of support for herself and her five children "is the income, if any, that [she] may earn working at Prestige."

50. Enforcement of the Noncompete Clause [] would likely result in the forced forfeiture of Ms. Gagnon's real estate broker's license in [Hawai'i].

51. Enforcement of the Noncompete Clause would require Ms. Gagnon to leave the State of [Hawai'i] to find work as a real estate broker.

52. Enforcement of the Noncompete Clause would place an undue hardship on Ms. Gagnon by severely limiting her earning potential in the only industry in which she has worked in the last 27 years.

The circuit court concluded that Locations' sole interest in enforcing the non-compete clause was to prevent competition and therefore lacked a legitimate protectible interest and was illegal under HRS § 480-4(a). The circuit court also alternatively deemed the non-compete clause unreasonable under Traeger, 57 Haw. at 122, 551 P.2d at 170, because it: (1) was greater than required for Location's protection; (2) imposed an undue hardship upon Gagnon; and (3) the benefit to Locations was outweighed by the injury to the public. The circuit court also found the non-solicitation clause unreasonable and an illegal restraint on trade and commerce.

The circuit court issued its judgment in favor of Gagnon on December 9, 2016. On December 28, 2016, the circuit court also granted in part Gagnon and Prestige's motion for attorney's fees and costs. Locations appealed the circuit court's decision to the ICA.

11

**B.    ICA proceedings**

On April 15, 2020, the ICA issued its memorandum opinion. Prudential Locations, LLC v. Gagnon, CAAP-16-0000890 (App. Apr. 2020) (mem.).  The ICA held that the non-compete clause was reasonable because its geographical scope was limited to the State of Hawai'i and its one-year duration was "no longer than other such covenants approved by Hawai'i courts."  Prudential Locations, LLC, mem. op. at 14.  The ICA further ruled that the non-compete clause did not impose undue hardship on Gagnon and the benefit to Locations was not outweighed by any injury to the public.  Id.  The ICA held the non-solicitation clause valid for the same reasons.  Prudential Locations, LLC, mem. op. at 15. The ICA did not, however, address whether Locations had a legitimate protectible interest.

The ICA vacated the circuit court's FOFs, COLs, and orders on the parties' motions for summary judgment and the circuit court's award of attorney's fees and costs.  Id.

### III.  Standard of Review

A circuit court's grant or denial of summary judgment is reviewed de novo.  Ralston v. Yim, 129 Hawai'i 46, 55, 292 P.3d 1276, 1285 (2013).  Furthermore,

> Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the

12

effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and inferences drawn therefrom in the light most favorable to the party opposing the motion.

129 Hawai'i at 55-56, 292 P.3d at 1285-86 (cleaned up).

In sum, this court's case law indicates that a summary judgment movant may satisfy their initial burden of production by either (1) presenting evidence negating an element of the non-movant's claim, or (2) demonstrating that the non-movant will be unable to carry their burden of proof at trial. Where the movant attempts to meet their burden through the latter means, they must show not only that the non-movant has not placed proof in the record, but also that the movant will be unable to offer proof at trial. Accordingly, in general, a summary judgment movant cannot merely point to the non-moving party's lack of evidence to support their initial burden of production if discovery has not concluded. (Merely asserting that the non-moving party has not come forward with evidence to support its claims is not enough.).

129 Hawai'i at 60-61, 292 P.3d at 1290-91 (cleaned up).

## IV. Discussion

Gagnon's Application presents four questions:

A. Whether the ICA's Opinion that held a Non-Compete Agreement whose sole admitted intent by its drafter was to prevent competition legal and enforceable was directly inconsistent with the Hawai'i statutory and case law.

B. Whether the ICA committed a grave error in failing to address the absence of any legitimate protectible interest in support of the Non-Compete Agreement.

C. Whether the ICA committed a grave error in its analysis of the "reasonableness" of the Non-Compete Agreement.

D. Whether the ICA committed a grave error in failing to determine the protectible interest for the Non-Solicitation clause and in enforcing a restriction against the solicitation of "employees" and "affiliates" against "real estate brokers."

13

A. **Summary judgment was properly granted in favor of Gagnon as to the non-compete clause**

   1. **The enforceability of non-compete covenants in Hawai'i and other states**

Under the common law, restrictive covenants in employment agreements were considered valid as long as they were reasonable.  Edwards v. Arthur Andersen, LLP, 189 P.3d 285, 290 (Cal. 2008).  The more recent trend in the United States has been toward restricting the enforceability of non-compete covenants.  See Rachel Arnow-Richman, The New Enforcement Regime: Revisiting the Law of Employee Competition (And the Scholarship of Professor Charles Sullivan) With 2020 Vision, 50 Seton Hall L. Rev. 1223 (2020) (discussing different states' approaches to non-competition covenants).

While the majority of states continue to apply some form of the common law reasonableness analysis, others have moved toward bans on all or specific types of non-compete covenants.  For example, California law provides that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void[,]" with statutory exceptions for non-compete agreements related to the sale and dissolution of corporations, partnerships, and limited liability corporations.  CAL. CIVIL CODE § 16600 (West through Ch. 19 of 2021 Reg. Sess.); Edwards, 189 P.3d at 291 ("[O]ur courts have consistently affirmed that section 16600 evinces a settled

legislative policy in favor of open competition and employee mobility.").[4]

Under Hawai‘i law, pursuant to HRS § 480-4(a), "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State, or in any section of this State is illegal."  HRS § 480-4(c) then enumerates several types of restrictive covenants that may be lawfully entered into "ancillary to a legitimate purpose not violative of this chapter."[5]  (Emphasis added.)

---

[4]    North Dakota, Oklahoma, and Washington D.C. have also passed legislation generally prohibiting non-compete covenants.  N.D. CENT. CODE § 9-08-06 (2019); OKLA. STAT. tit. 15, § 217 (2001); D.C. CODE § 32-581.02 (2021). Other states have prohibited non-compete covenants for certain categories of employees.  For instance, Illinois, Maine, Maryland, Massachusetts, New Hampshire, Rhode Island, and Washington have enacted legislation prohibiting employers from entering into non-compete covenants with employees below certain income levels.  820 ILL. COMP. STAT. 90/10 (2017); ME. STAT. tit. 26, § 599-A (2019); MD. CODE ANN., LAB. & EMPLY. § 3-716 (2019); MASS. GEN. LAWS ch. 149, § 24L (2021); N.H. REV. STAT. ANN. § 275:70 (2019); 28 R.I. GEN. LAWS § 28-59-3 (2020); WASH. REV. CODE § 49.62.020 (2020).

[5]    HRS § 480-4(c) provides:

> Notwithstanding subsection (b) and without limiting the application of subsection (a), it shall be lawful for a person to enter into any of the following restrictive covenants or agreements ancillary to a legitimate purpose not violative of this chapter, unless the effect thereof may be substantially to lessen competition or to tend to create a monopoly in any line of commerce in any section of the State:
>
>> (1) A covenant or agreement by the transferor of a business not to compete within a reasonable area and within a reasonable period of time in connection with the sale of the business;
>> (2) A covenant or agreement between partners not to compete with the partnership within a reasonable area and for a reasonable period of time upon the withdrawal of a partner from the partnership;

In Traeger, 57 Haw. 113, 551 P.2d 163, we considered whether the permissible restrictive covenant exceptions in HRS 480-4(c)[6] are exclusive. We held "the restrictive covenants and agreements enumerated under [HRS §] 480-4(c) were not meant to be exclusive in their respective fields." 57 Haw. at 121, 551 P.3d at 170. We noted the drafters of HRS § 480-4(c) "intended to have courts analyze all restrictive covenants that are not listed as 'per se violations,' and determine their validity" based on whether the covenant was "reasonable" as a matter of law. Id. We held that a restrictive covenant is not reasonable if: "(i) it is greater than required for the protection of the person for whose benefit it is imposed; (ii) it imposes undue hardship on the person restricted; or (iii) its

---

(3) A covenant or agreement of the lessee to be restricted in the use of the leased premises to certain business or agricultural uses, or covenant or agreement of the lessee to be restricted in the use of the leased premises to certain business uses and of the lessor to be restricted in the use of premises reasonably proximate to any such leased premises to certain business uses;
(4) A covenant or agreement by an employee or agent not to use the trade secrets of the employer or principal in competition with the employee's or agent's employer or principal, during the term of the agency or thereafter, or after the termination of employment, within such time as may be reasonably necessary for the protection of the employer or principal, without imposing undue hardship on the employee or agent.

[6]     See supra note 4.

16

benefit to the covenantee is outweighed by injury to the public[.]"[7] Traeger, 57 Haw. at 122, 551 P.3d at 170 (cleaned up).

Then in 7's Enterprises, Inc. v. Del Rosario, 111 Hawai'i 484, 493 143 P.3d 23, 32 (2006), we held in relevant part that, while not exhaustive, "training that provides skills beyond those of a general nature is a legitimate interest which may be considered in weighing the reasonableness of a non-competition covenant, when combined with other factors weighing in favor of a protectible business interest such as trade secrets, confidential information, or special customer relationships." Hence, although the permissible restrictive covenant exceptions provided in HRS 480-4(c) are not exclusive, HRS § 480-4(c) requires that a restrictive covenant or agreement in restraint of commerce or trade be "ancillary to a legitimate purpose not violative of [Chapter 480]." Even if a restrictive covenant otherwise satisfies the Traeger three-factor reasonableness

---

[7] Traeger upheld the non-compete clause in question as reasonable, concluding there was "ample evidence as to these factors and other facts necessary for the court to have made its 'reasonableness analysis.'" Traeger, 57 Haw. at 122, 551 P.2d at 170. But see Hazel G. Beh & H. Ramsey Ross, Non-Compete Clauses in Physician Employment Contracts Are Bad for Our Health, 14 HAW. B.J. 79, 83-85 (2011) (criticizing Traeger's analysis and the "modern trend among jurisdictions that is deferential to employers and elevates freedom of contract principles above the traditional judicial stance that rendered them suspect").

test, it is unenforceable unless it is ancillary to a legitimate purpose not violative of Chapter 480.[8]

## 2. The non-compete clause was not ancillary to a legitimate purpose

The ICA did not address whether the non-compete and non-solicitation clauses within this Non-Compete Agreement were "ancillary to a legitimate purpose" as required by HRS § 480-4(c).

Locations argues its legitimate purpose was to prevent Gagnon from using proprietary information obtained as a sales

---

[8] In 2015, Hawai'i joined the trend toward restricting the enforceability of non-compete agreements.  HRS § 480-4 was amended to preclude non-compete and non-solicitation clauses in the technology industry.  The new HRS § 480-4(d) (Supp. 2015) provides in relevant part:

> Except as provided in subsection (c)(4), it shall be prohibited to include a noncompete clause or a nonsolicit clause in any employment contract relating to an employee of a technology business. The clause shall be void and of no force and effect.

In enacting this amendment, the legislature noted that "Hawai['])i has a strong public policy to promote the growth of new businesses in the economy, and academic studies have concluded that embracing employee mobility is a superior strategy for nurturing an innovation-based economy."  2015 Haw. Sess. Laws Act 158, § 1.  It also found that "restrictive employment covenants impede the development of technology businesses within the State by driving skilled workers to other jurisdictions and by requiring local technology businesses to solicit skilled workers from out of the State."  Id. The legislature acknowledged Traeger's holding that non-compete agreements can be enforced if they are reasonable.  Id.  However, the legislature then stated, "[e]mployer trade secrets are already protected under the federal Uniform Trade Secrets Act and under section 480-4(c)(4), [HRS]; therefore, the benefits to the employer from noncompete or nonsolicit agreements are duplicative and overreaching protections that may unreasonably impose undue hardship upon employees of technology businesses and the Hawai'i economy." Id.  While Act 158 of 2015 bans non-compete agreements in the technology industry only, the legislature stressed Hawai'i's strong public policy in promoting the growth of new businesses.

coach, from forming a competing firm, and from "poaching" its agents.

Locations argued it had an interest in "protecting . . . its proprietary systems, its customer management, the training modules it's developed over 40 years, the information that was provided on a system-wide basis, including managerial reports to Ms. Gagnon about how to optimize the success of its sales force," as well as Gagnon's "access to confidential materials, proprietary materials that were the secret sauce, if you will, of why Locations is one of, if not the most, successful local real estate companies in Hawaii."  Locations argued that it sought to protection against unfair competition, which it contended was knowledge and skills Gagnon allegedly acquired as a Locations employee:

> She had been an entrepreneur running her own franchise in New Hampshire for four years. What she didn't know was how to be a real estate again in this market. She came to Hawaii. We paid her hundreds of thousands of dollars <u>to learn our systems and train our sales agents</u>, and then she left.

(Emphasis added).

Even if non-trade-secret, confidential business information constitutes a "legitimate business interest" for purposes of a non-compete agreement under Hawaiʻi law, the record in this case does not reflect a genuine issue of material fact as to the existence of such non-trade-secret, confidential business information.  Contrary to the dissent, the information that

19

Locations asserts constitutes a protectible legitimate purposes was not actually "confidential." As noted by the circuit court, other Locations employees and managers with similar or more access to the allegedly confidential information were not restricted by non-compete agreements.[9] For example, only some of the eighteen sales coaches employed by Locations were subject to non-compete agreements. Further, despite Locations' purported confidentiality concerns, the non-compete clause only prohibited Gagnon from starting her own firm, but permitted her to work for an existing brokerage firm even within one year of leaving Locations. In addition, Locations did not produce any evidence of and did not dispute that there was no trade secret violation.[10]

---

[9] As indicated in the circuit court's FOF 43 quoted above, two coaches hired after Gagnon had no-post employment restriction agreements. Also, as indicated in FOFs 37 and 40, the supervisor of the sales coaches as well as former or current employees were not bound by any non-compete agreements. The record does not reflect that Gagnon was provided with any unique or specialized training by Locations. Gagnon actually brought with her to Locations twenty-five years of prior experience in the real estate industry and was hired as a "sales coach." Moreover, Locations held monthly corporate sales meetings, open to real estate agents from other brokerage firms, where training materials were shown via a PowerPoint presentation to all attendees, including real estate agents from other firms.

[10] Under Hawai'i law:

> "'Trade secret' means information, including a formula, pattern, compilation, program device, method, technique, or process that:
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Locations also argued that a protectible "legitimate purpose" was to prevent Gagnon from forming a competing firm. Tabori stated during his deposition that preventing competition from new firms was a purpose of the non-compete agreement:

> Q. You said that the rationale for having a noncompete that prevents someone from forming a new entity such as Ms. Gagnon's restrictive covenant is that you don't want someone to start up a new competing enterprise against you, essentially with your stuff. Fair?
> A. That would be the reason to put that language into the noncompete that Lorna Gagnon signed, fair.

Preventing competition, however, is not a legitimate ancillary purpose under HRS § 480-4(a). The plain language purpose of HRS § 480-4(A) is to prohibit contracts in restraint of commerce or trade in the State.

Hence, although based on different reasoning than the circuit court, we hold that summary judgment was properly granted in favor of Gagnon with respect to the non-compete clause. See Kahaikupuna v. State, 109 Hawaiʻi 230, 233-34, 124 P.3d 975, 978-79 (2005) (affirming summary judgment on different grounds than the trial court and explaining that an appellate court may affirm a grant of summary judgment on any ground appearing in the record) (cleaned up).[11]

---

HRS § 482B-2 (2008).

[11]    We note that as part of the reasonableness analysis, Gagnon had argued that consumers should be able to choose their own providers of real estate services. With respect to non-competes in professional services contracts generally, the Washington Court of Appeals has stated, "public policy requires [a court] to carefully examine covenants not to compete, even when

21

## B. A genuine issue of material fact exists as to one agent with respect to the non-solicitation clause

### 1. Non-solicitation clauses also require a legitimate ancillary purpose

Gagnon also asserts the ICA "failed to address the independent legality of the non-solicitation clause."[12]

Solicitation clauses are also contracts in restraint of trade or commerce that require a legitimate ancillary purpose under HRS § 480-4(a).  As explained above, preventing competition is not a legitimate ancillary purpose, and the alleged purpose of protecting confidentiality lacks merit in this case.

---

protection of a legitimate business interest is demonstrated, because of equally competing concerns of freedom of employment and free access of the public to professional services."  See Knight, Vale & Gregory v. McDaniel, 37 Wash. App. 366, 370, 680 P.2d 448, 452 (Wash Ct. App. 1984).  See also Professor Beh's article with respect to medical professionals, supra note 6.  We also note that Rule 5.6 of the Hawai'i Rules of Professional Conduct provides:

> A lawyer shall not participate in offering or making:
>      (a)  a partnership, shareholders, operating, employment, or other similar type of agreement that restricts the right of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement or as permitted by Rule 1.17 of these Rules; or
>      (b)  an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy.

Thus, the Hawai'i legal profession does not allow non-compete agreements.

[12]    Gagnon also maintains that real estate agents are not "employees" or "affiliates" covered by the non-solicitation clause, and that the non-solicitation clause was unreasonable if it applied to the solicitation of agents.  These arguments lack merit and we do not address them further.

Workforce stability and customer relationships can, however, be legitimate ancillary interests for an agreement prohibiting the solicitation of employees.  See, e.g., Arpac Corp. v. Murray, 589 N.E.2d 640, 649-50 (Ill. App. Ct. 1992) (holding that a non-solicitation agreement was "enforceable and not void" because it "was reasonably calculated to protect [the employer's] interest in maintaining a stable work force"); Genesee Valley Tr. Co. v. Waterford Grp., 14 N.Y.S.3d 605, 609 (N.Y. App. Div. 2015) ("A covenant not to solicit employees is inherently more reasonable and less restrictive than a covenant not to compete, and an employer has a legitimate interest in preventing an employee from leaving to work for a competitor if the employee has cultivated personal relationships with clients through the use of the employer's resources.") (citations and quotations omitted).

## 2. "Solicitation" requires an active initiation of contact

In this case, the non-solicitation clause prohibited Gagnon from soliciting other persons employed or affiliated with Locations by "induc[ing] or encourage[ing][them] to terminate their relationship with the Company."[13]  Three agents, including Sherrie Au ("Au"), joined Gagnon at Prestige after learning she was leaving Locations.  These agents' termination of their

---

[13]  Merely "encouraging" someone to leave employment cannot constitute "solicitation"; employees are "encouraged" by family and friends to switch employers for various reasons.

employment with Locations and subsequent employment with Prestige do not automatically demonstrate a violation of the non-solicitation clause.

Our law does not clearly define "solicitation." We agree with reasoned opinions from other jurisdictions and now hold that "solicitation" requires an active initiation of contact. Thus, to withstand summary judgment for a violation of the non-solicitation clause, evidence indicating that Gagnon actively initiated contact with the agents that joined her must have existed. See UARCO Inc. v. Lam, 18 F. Supp. 2d 1116, 1121 (D. Haw. 1998) (holding a non-solicitation agreement enforceable where the former employees' admitted to calling company's customers and informing them of their new employment); Prosonic Corp. v. Stafford, 539 F. Supp. 2d 999, 1004 (S.D. Ohio 2008) (holding that employer's claim that a former employee solicited other employees was "mere speculation" because employer failed to produce evidence that former employee personally induced employees to leave the company); Atmel Corp. v. Vitesse Semiconductor Corp., 30 P.3d 789, 793 (Colo. App. 2001) (interpreting "solicitation" to require actively initiated contact).

Here, the record reflects a genuine issue of material fact with respect to Gagnon's active initiation of contact only with respect to Au. The conversations Gagnon had with the subject

24

agents to inform them that she was leaving Locations do not, by themselves, constitute active initiation of contact or "solicitation." With respect to Au, however, on July 2, 2013, about one month before her last day at Locations, Gagnon emailed Au, saying "Any chance you have Friday this week open? There is something I want to discuss with you and it cannot wait till next week as planned." Three days later, Gagnon and Au met for lunch. Regarding her conversation with Au, Gagnon provided the following declaration:

> On July 5, 2014, I had lunch with Sherrie Au. During lunch, I informed Sherri of my decision to leave Prudential and my plans for opening up a RE/MAX franchise. I explained to her my plans. Sherrie stated that she always said that she would go with me if I left Locations. I responded by stating that Kevin and I could not think of any other person we would rather have be our partner. Sherrie and I did not at that time discuss any organizational structure of a new company. There was no understanding at the time as to what role Sherrie would have or if she would even join me in the new company. Sherrie then sent me a set of points and questions that she wanted answered by me before she reached any decision.

(Emphasis added.) Although Au attested she left Locations on her own volition and that Gagnon did not solicit her to leave, the record reflected possible active initiation of contact of Au by Gagnon, precluding summary judgment. Thus, this case is remanded to the circuit court only with respect to the alleged violation of the solicitation clause as to Au.

## V. Conclusion

For these reasons, we vacate and affirm the lower courts' orders and judgments as follows.

25

The ICA's Order Granting in Part and Denying in Part Motion for Fees and Costs filed on June 26, 2020 is vacated.

The following circuit court orders and judgments are vacated only with respect to the parts relating to the non-solicitation clause and Au:

1. The Findings of Fact, Conclusions of Law, and Order Denying Plaintiff Prudential Locations LLC n/k/a Locations LLC's Motion for Partial Summary Judgment Against Gagnon filed on August 25, 2016 only as to Locations' breach of contract claim against Gagnon arising out of Gagnon's alleged breach of the non-solicitation clause as to Au;

2. The Findings of Fact, Conclusions of Law, and Order Granting Defendants Lorna Gagnon and Prestige Realty Group Limited Liability Company's Cross-Motion for Summary Judgment on the First Amended Complaint of Plaintiff Prudential Locations, LLC n/k/a/ Locations LLC filed on August 25, 2016 only as to Locations' breach of contract claim against Gagnon arising out of Gagnon's alleged breach of the non-solicitation clause as to Au;

3. The Findings of Fact, Conclusions of Law, and Order Granting Defendants' RE/MAX LLC and Lorraine Clawson's Cross-Motion for Summary Judgment Against Plaintiff Prudential Locations, LLC filed on August 25, 2016 only

as to Locations' tortious interference claims against RE/MAX and Clawson arising out of their alleged encouragement and inducement of Gagnon to breach the non-solicitation clause as to Au;

4. The following paragraphs in both the Judgment filed on December 9, 2016 and the Final Judgment filed on March 22, 2017:

   a. Paragraph 1 to the extent that it entered judgment in favor of Gagnon with respect to her alleged breach of the non-solicitation clause as to Au,

   b. Paragraph 3 to the extent that it entered judgment in favor of RE/MAX with respect to RE/MAX's alleged tortious interference with the non-solicitation clause in Gagnon's agreement with Locations as it related to Au, and

   c. Paragraph 4 to the extent that it entered judgment in favor of Clawson with respect to Clawson's tortious interference with the non-solicitation clause in Gagnon's agreement with Locations as it related to Au;

5. The Order Granting in Part and Denying in Part Defendants Lorna Gagnon and Prestige Realty Group Limited Liability Company's Motion for Award of Attorney's Fees and Costs Against Plaintiff Prudential

27

Locations, LLC n/k/a Locations, LLC filed on December 28, 2016;

6. The Order Granting in Part and Denying in Part Defendants RE/MAX, LLC and Lorraine Clawson's Renewed Motion for Award of Attorneys' Fees and Costs Against Plaintiff Prudential Locations, LLC, n/k/a Locations, LLC filed March 3, 2017; and

7. Paragraphs 7 through 10 of the Final Judgment filed on March 22, 2017.

All other circuit court orders and judgments are affirmed.

| | |
|---|---|
| Matt A. Tsukazaki<br>for petitioners/defendants-appellees | /s/ Sabrina S. McKenna |
| | /s/ Michael D. Wilson |
| William J. Kelly III, pro hac vice<br>(Jamie C. S. Madriaga and<br>Duane R. Miyashiro,<br>with him on the briefs)<br>for respondents/defendants-appellees | /s/ Trish K. Morikawa |



John Rhee
(Paul Alston and Kristin L. Holland,
with him on the briefs)
for respondent/plaintiff-appellant

Joseph A. Ernst
for amicus curiae
Chamber of Commerce Hawaii